Circuit Court for Anne Arundel County
Case No. C-02-JV-16-000262 & 263

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2234

September Term, 2016

IN RE: ADOPTION/GUARDIANSHIP OF
C.A. AND D.A.

Kehoe,
Leahy,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.

Opinion by Kenney, J.

Filed:  August 30, 2017

On September 15, 2014, the Circuit Court for Anne Arundel County, sitting as the juvenile court, declared D.A. and C.A., children of A.C.-R., appellant ("Father"), each to be a Child in Need of Assistance ("CINA"). D.A. and C.A. (the "Children") were placed in the custody of the Anne Arundel County Department of Social Services (the "Department"). In 2016, the Department filed a petition seeking to terminate appellant's parental rights. Following a hearing, the court granted the Department's petition and terminated appellant's parental rights. In this appeal, appellant presents the following question for our review:

Did the circuit court err in terminating [a]ppellant's parental rights?

For reasons to follow, we answer appellant's question in the negative and affirm the judgment of the circuit court.

## BACKGROUND

C.R.-A. ("Mother") gave birth to D.A. and C.A. on February 7, 2007 and February 20, 2009, respectively.[1] Father, who was in the country illegally, was arrested in 2010 "due to domestic violence between himself and the children's mother" and was eventually deported to his home country of Mexico. At that time, Mother and her five minor children, all of whom were the children of Father, "resided in a boarding house with multiple families known for illegal activities including drug use, gambling and excessive alcohol." In 2011, Mother was indicated for neglect by the Prince George's County Department of Social Services (hereinafter "PGDSS").

---

[1] Mother consented to the adoption of D.A. and C.A. and voluntarily relinquished her parental rights. She is not a party to this appeal.

In August of 2013, Mother befriended Levi R. and Mary D., a married couple whom she met while the couple was doing missionary work for their church. At the time, Mother was living in a tent in Washington D.C. with her five children, including D.A. and C.A., and her boyfriend, Phillipe W. Not long after meeting Levi R. and Mary D., Mother asked Mr. R. if he and his wife would care for the five children. The couple agreed and eventually filed for emergency custody of all five. The juvenile court granted custody of the five children to Mr. R. and Ms. D. in December of 2013. In that order, the court found that Father had "no present involvement in the case."

Around the same time, Father was arrested and incarcerated in a federal prison in Louisiana because he again came into the United States illegally and was "trying to bring others into the country." The record does not disclose Father's whereabouts between the time he was deported in 2010 and the time he was incarcerated in 2013.

In February 2014, PGDSS investigated a report of child sexual abuse against Phillipe W. involving D.A. and C.A. The alleged sexual abuse happened "sometime in later 2012 or early 2013" when the Children were living in a tent with Mother and Phillipe W. PGDSS ultimately determined that the allegations involving D.A. were "indicated;" a finding of "unsubstantiated" was issued regarding the allegations involving C.A.

In July of 2014, Mr. R. informed the Department that he and his wife could no longer care for the Children. The Department subsequently filed and was granted a Petition with Request for Shelter Care, and D.A. and C.A. were placed in foster care.[2] At the time,

---

[2] The Department also filed custody/guardianship petitions regarding the other three children.

Mother's whereabouts were unknown, while Father remained incarcerated in federal prison. In August of 2014, the court held a review hearing regarding the shelter care order, and, on September 15, 2014, the court found D.A. and C.A. to be CINA and ordered out-of-home placement under the care of the Department.

The court held another review hearing in January of 2015. By this time Mother had been located and was present at the hearing. Also present was counsel for Father, who remained in federal detention.[3] Following the hearing, the court found that the Department had made reasonable efforts at reunification. The court also ordered that D.A. and C.A. were to remain in the custody of the Department and that Mother be allowed supervised visitation. The court made no findings regarding Father.

In May of 2015, the court held a hearing regarding D.A. and C.A.'s permanency plans. Again, Mother and counsel for Father were present for the hearing. Following the hearing, the court found that Mother had made "no progress toward correcting the problems that caused the children to be placed in foster care," that she continued "to live with a man who may have abused one of her children," that she had no employment or place to live, and that she continued "to test positive for illegal drugs." The court also noted that Father remained "incarcerated in Louisiana." As a result of these and other findings, the court ordered that D.A. and C.A.'s permanency plans be changed from reunification to custody and guardianship with a relative.

---

[3] The record is unclear as to whether Father's counsel made any arguments on his behalf.

In November of 2015, the court held another hearing regarding D.A. and C.A.'s permanency plans. Mother and counsel for Father were present at the hearing, and Father, who was still incarcerated, participated by telephone. The court ultimately ordered that D.A. and C.A.'s permanency plans be changed to custody and guardianship by a non-relative. The Department, in April of 2016, filed petitions for guardianship of D.A. and C.A., and the court held a hearing on the Department's petitions in October of 2016.

At that hearing, Maggie Swink, one of the Department's assigned in-home services workers for D.A. and C.A., testified that, during her time as the Children's caseworker, the Department provided Mr. R. and Ms. D. with various in-home services, including weekly visits, assisting with clothing and food for the Children, offering referrals for therapy, and working with the couple on parenting techniques. Ms. Swink also testified that she contacted Father regarding placement for the Children and that Father provided two potential resources: his mother and a "fictive relative that he called a cousin who was living in California." Ms. Swink could not locate Father's "cousin" but did manage to locate his mother, who indicated that she was not willing to be a resource at that time. Ms. Swink also reported that she tried to communicate with Father on other occasions and that she "sent him court reports."

Hadassah Freed, who replaced Ms. Swink as the Children's caseworker in August of 2014, testified that Father was in prison the whole time she was his caseworker, that she only spoke with him "two or three times," and that he tried to contact her only one time. Ms. Freed also testified that she mailed "every service agreement" to Father but never

4

received a signed service agreement in return. When asked about Father's phone contact with the Children, Ms. Freed responded that "it wasn't frequently."

She also reported that Father informed her that he had family in the United States and that his mother was "available in Mexico." She had "phone conversations" with his family in the United States, and she contacted the International Social Services regarding his mother. The International Social Services completed a home study with Father's mother, which, according to Ms. Freed, had been "favorable." Ms. Freed left the Department in April of 2015, before she could follow up on any of these resources.

Following Ms. Freed's departure, Kimberly McKay was assigned as D.A. and C.A.'s caseworker. Ms. McKay reported that she made several attempts to reach Father by phone but was unable to do so. She also sent several service agreements to Father for him to sign, but Father never sent any back. Ms. McKay also spoke with Father's mother about "possibly coming here to the United States . . . to care for the children," but she was "denied her visa to the United States." Ms. McKay stated that she later investigated Father's niece in Arizona as a potential resource, but the niece did not take the appropriate steps to initiate the process of becoming a resource. She also investigated Father's "cousin" in California and discovered that he was in the country illegally and without a known address.

In the meantime, D.A. and C.A.'s foster parents informed the Department that they could no longer care for the Children. In September of 2015, the Children were moved into the care of a new foster parent, Melanie R., with whom they now live. Ms. R. testified that the Children's adjustment into her home had gone "extremely well," that they loved

school and reading, and that they were involved in numerous activities, including soccer and Girl Scouts. Ms. R. also testified that the Children regularly attended therapy and that she had not seen any behavioral problems with the Children since they moved into her home. She added that the Children had requested that they not be addressed by their birth names (D.A. goes by "S." and C.A. goes by "M."). When asked about long-term plans for the Children, Ms. R. responded that "they're going to be adopted by me."

Regarding the Children's relationship with Father, Ms. R. testified that the Children had been speaking with him by phone "less than once a month" but that the conversations had become more frequent in recent months. When Father and the Children spoke, there was "a language barrier" because Father spoke to the Children in Spanish, which neither child can speak fluently. Ms. R. reported that, during one conversation, Father suggested that he be allowed to live with her and the Children after his release.

After their permanency plans had been changed to adoption, D.A. and C.A.'s case was transferred to Susan Lonergan, a case manager with the Department's adoptions unit, in June of 2016. Ms. Lonergan testified that she conducted in-home visits with Ms. R. and the Children at least once a month and that she had no concerns about the Children's care under Ms. R. She reported that the Children were "always clean" and "always appropriately dressed" and that they were "happy" and "appear comfortable." According to Ms. Lonergan, the Children never expressed an interest in speaking with Father. Ms. Lonergan also testified that she made frequent attempts to reach Father's case manager in prison but that "they never call back." She also stated that she sent several documents to Father but that she did not receive any response.

Lisa Cammauf, a family support worker with the Department, testified that she had been assigned D.A. and C.A.'s case in November of 2014 and that she had worked with them ever since. Ms. Cammauf reported that she had been involved in several "team decision meetings" in which Father participated by telephone and that she had assisted in answering questions that he had regarding the Children. During one meeting, she told Father that his ability to be a resource for the Children was limited because he was in prison, to which Father responded that "when he gets out, no matter what, [D.A. and C.A.] are his children" and "he will do everything he can to come back and…get his kids." Father reiterated this sentiment at a subsequent meeting in which he again participated by telephone.

Ida Johnson, a family therapist, testified that she had been treating D.A. and C.A. since July of 2014. Ms. Johnson reported that the Children had behavior problems when they first came into her care, including stealing, lying, wetting the bed, and fighting with their siblings. She attributed the Children's behavioral issues in part to the instability of their home life and having to continually adjust to new surroundings.

Regarding D.A. and C.A's current situation, Ms. Johnson reported that the Children had adjusted "very well" to life with Ms. R.; that Ms. R. was "very committed" to the Children's therapy; and, that Ms. R. and the Children were "very bonded" and "very affectionate." She further stated that the Children were "making significant progress adjusting to their new home" and that they "appear happy and comfortable with their surroundings."

Father testified by telephone from prison, admitting that he is "an illegal alien" and that, on at least two occasions, he had entered the United States illegally.[4] According to Father, it was his last entry into the United States, which occurred in December of 2013, that resulted in his being incarcerated. He also stated that he would not be released until July of 2017, at which time he would be deported to Mexico. Father asserted that he was not to blame for "everything that's happened" and that he loved his Children and wanted to do "absolutely everything possible to be with them." He also claimed that after his deportation he would "find a way to come back" but that if he could not "God will bless them anyway." Father stated that he had not seen D.A. or C.A. since 2012.

As to resources available to him, Father testified that his mother had been willing to care for the Children but that she had passed away prior to the hearing. He also reported that he had a cousin in California but that he did not know the cousin's name. As to the Department's efforts in providing services, Father testified that he and the Department had "had meetings;" that the Department told him that there were papers he needed to sign; that the Department had sent him letters "all about court hearings, meetings;" and, that the Department sent him updates on the Children.

At the close of the hearing, the court issued a written order terminating Father's parental rights and granting the Department the authority to consent to D.A. and C.A.'s adoption. In so doing, the court made the following findings:

> The Juvenile Court finds after giving primary consideration to the health and safety of [D.A. and C.A.] and consideration to each of the relevant statutory factors, it is in the best interests of each minor child…to terminate the

---

[4] Father testified through an interpreter.

8

parental rights of [Father.]… He is not able to provide a safe and healthy environment for the children. [Father], has been incarcerated in a federal prison since December 2013, and is due to be deported to Mexico upon his release in July 2017, nine months from this hearing. He entered the U.S. illegally resulting in his incarceration. This is his second incarceration for illegal entry, and this second time he was incarcerated for transporting other illegal immigrants into the United States. He has not seen his children since sometime in 2012…. There has been some contact by telephone, once a week approximately these past few months…. The father has not provided care for his children in approximately four years.

[D.A. and C.A.] want to remain in the care of their current foster mother who is an adoptive resource. They have adjusted well to their home and are in a stable and nurturing environment.

The father is not in any better circumstance than when the children were placed in foster care in July 2014, 26 months ago, or even 11 months prior to that date when the mother asked [Mr. R.] to take her five children.

* * *

The Court finds that pre-placement services were not offered to the father because he was incarcerated in a federal prison in Louisiana beginning in December 2013.

* * *

The Department was able to locate [Father] at the federal prison and discussed with him by telephone the children's placement into foster care. In response to the request of the Department. [Father] provided the names of paternal relative residing in Mexico and [a] fictive relative, first name only, in the United States. The Department attempted to contact the relative by written correspondence, but at least initially, the paternal grandmother was not able to be a resource.

The Court finds that the extent, timeliness, and nature of the services offered to [Father] was reasonable given his out of state incarceration during the entire time the children were in foster care. The father was included by telephone in two Team Decision Making meetings: May 2015 and in February 2016…. The Department secured the assistance of interpreters and translators to ensure meaningful communication with [Father]. The Department sent written documents, service agreements, letters and court orders, to [Father] in both English and Spanish.

9

* * *

Because the father was incarcerated…in federal prisons, not to be released until July 2017, but to be deported back to Mexico upon his release, any further attempts at reunification services to him were prohibitive and futile.

This Court finds that the Department has fulfilled its obligations under the agency service agreements with the parents, but that neither parent met its obligations in full under the service agreements. The Department attempted to enter into service agreements with the father, who did not return any document signed…. Although the father did not return a signed agreement to the Department, he did contact the Department by phone to confirm receipt of the first service agreement. The Department discussed with him by telephone service plans and obligations and court orders. At no time did he state to the Department that he did not understand what had been sent or explained to him about his children.

* * *

The Court finds that the father…is not a resource for his children. He indicated in a letter to the Department that his plan was to take the children to Mexico once established there. He also stated in both May 2015 and February 2016 that he was "going to get" his children, even if it meant his entering into the United States again illegally.

The Court finds that the Department made reasonable efforts to attempt to maintain regular contact with the father by phone and mail service…. The Department made regular attempts to speak with him and his case manager. The Department attempted to arrange a translation service ("Language Link") for the father (who speaks some English but [D.A. and C.A.] have some difficulty understanding him, and the foster mother does not speak Spanish) to facilitate communication with the children but the prison would not permit the service.

Contact between the father and foster mother, while feasible, has been minimal…. The father has been inappropriate. He asked the foster mother during one phone call to allow him to live with her when he is released from prison. She told him no.

The Court finds that the father has not contributed financially to a reasonable part of the child's care and support.

10

The Court finds that there has not been any evidence presented that the father has a disability that renders [him] consistently incapable of caring for the children's immediate and ongoing physical and psychological needs for long periods of time.

This Court finds that additional services would not be likely to bring about a lasting adjustment so that the children could be returned to the father within an ascertainable time not to exceed 18 months from the date of placement. The children have been in care over 26 months. The children have been out of the care of the father, for over an estimated four years.

* * *

This Court finds that [D.A. and C.A.] have adjusted to their community, foster home, and school. The Court further finds that there are no known or reasonably foreseeable negative feelings demonstrated by the children regarding the severance of the parent-child relationship and that the likely impact of the termination of parental rights on each child's well-being is positive.

* * *

Recently, the girls started to call themselves by different names…. [They] made this decision independently. It is apparent that the girls are comfortable in their environment, that they are well cared for, and that they have a loving relationship with [Ms. R.]

* * *

This Juvenile Court further finds in consideration of *In re: Adoption/Guardianship of Rashawn H.*, 402 Md. 477 (2007) that continuation of the parental relationship of the father is not in the best interests of the children…due to exceptional circumstances that exist that make a continuation of the parental relationship detrimental to the best interests of the children, [D.A. and C.A.] As discussed *infra*, the father has not seen his children in approximately four years due to being incarcerated for a second illegal entry into the United States and will be deported back to Mexico in July 2017.

11

**STANDARD OF REVIEW**

Our review of the juvenile court's decision to terminate Father's parental rights involves three interrelated standards: (1) a clearly erroneous standard, applicable to the juvenile court's factual findings; (2) a *de novo* standard, applicable to the juvenile court's legal conclusions; and (3) an abuse of discretion standard, applicable to the juvenile court's ultimate decision. *In re Yve S.*, 373 Md. 551, 586 (2003). In other words, "when the appellate court views the ultimate conclusion of the [juvenile court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion." *Davis v. Davis*, 280 Md. 119, 234 (1977). An abuse of discretion occurs when the court's decision is "'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 313 (1997) (quoting *North v. North*, 102 Md. App. 1, 14 (1994)).

That said, "our function, in reviewing [the juvenile court's] findings, is not to determine whether, on the evidence, we might have reached a different conclusion." *In re Adoption No. 09598 in the Circuit Court for Prince George's County*, 77 Md. App. 511, 518 (1989). "Rather, it is to decide only whether there was sufficient evidence – by a clear and convincing standard – to support [the court's] determination that it would be in the best interest of [the child] to terminate the parental rights of [the parent]." *Id.* In making that decision, "we must assume the truth of all the evidence, and of all of the favorable inferences fairly deducible therefrom, tending to support the factual conclusion of the trial court." *Id.* (citation omitted). And, "in a case involving termination of parental rights, the

12

greatest respect must be accorded the opportunity [the trial court] had to see and hear the witnesses and to observe their appearance and demeanor." *In re Adoption/Guardianship Nos. 2152A, 2153A, 2154A in the Circuit Court for Allegany County*, 100 Md. App. 262, 270 (1994) (citations and quotations omitted). "Where the best interest of the child is of primary importance, 'the trial court's determination is accorded great deference, unless it is arbitrary or clearly wrong.'" *Id.* (citation omitted).

## DISCUSSION

Father argues that the circuit court erred in granting the Department's petition and terminating his parental rights. This is because "the record fails to establish that retaining the parental relationship would be detrimental to the children's best interests." He also maintains that "the Department did not do enough to provide him with services during his incarceration" and that "the services agreements did not meaningfully outline obligations for [Father] to complete." Finally, he avers that, although D.A. and C.A. "may have adjusted well with their pre-adoptive family," the existence of a bond between the Children and their foster family "cannot trump the father's liberty interest in maintaining his parental relationship" and "cannot be a dispositive consideration when evaluating whether parental rights should be terminated[.]"

The State counters that the court "properly found that exceptional circumstances justified a termination of parental rights based on its review of the factors set forth in § 5-323(d) of the Family Law Article," which, according to the State, permits a court to "terminate a parental relationship if the court finds by clear and convincing evidence that termination is in the child's best interests." The State posits that the Children have a right

13

to a stable environment and that the court's decision "properly promotes the [C]hildren's best interests by providing them with a stable and permanent adoptive home which will meet their emotional and physical needs."

The right of a parent to raise his child, "recognized by constitutional principles, common law and statute, is so fundamental that it may not be taken away unless clearly justified." *In re Adoption Guardianship No. 10941 in the Circuit Court for Montgomery County*, 335 Md. 99, 112 (1994). And, "[w]hen the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified." *Walker v. Gardner*, 221 Md. 280, 284 (1960).

Nevertheless, the fundamental right of a parent to raise his child "is not absolute and does not exclude other important considerations." *In re Mark M.*, 365 Md. 687, 705 (2001). For instance, "the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves." *Id.* In addition, our appellate courts have long held that "the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." *Boswell v. Boswell*, 352 Md. 204, 219 (1998).

In harmonizing these competing interests, the Court of Appeals has recognized "a substantive presumption – a presumption of law and fact – that it is in the best interest of

14

children to remain in the care and custody of their parents." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 495 (2007). "That presumption, however, has limits, and the right of a parent to make decisions regarding the care, custody, and control of their children may be taken away where (1) the parent is deemed unfit, or extraordinary circumstances exist that would make a continued relationship between parent and child detrimental to the child, and (2) the child's best interests would be served by ending the parental relationship." *In re Adoption/Guardianship of Jasmine D.*, 217 Md. App. 718, 733 (2014) (citation omitted).

In short, the presumption that it is in a child's best interests to remain in the care and custody of his parent "may be rebutted upon a showing either that the parent is 'unfit' or that 'exceptional circumstances' exist which would make continued custody with the parent detrimental to the best interest of the child." *In re Rashawn H.*, 402 Md. at 495. Therefore, "in all cases where the interests of a child are in jeopardy the paramount consideration is what will best promote the child's welfare, a consideration that is of 'transcendant importance.'" *In re Adoption/Guardianship No. A91-71A*, 334 Md. 538, 561 (1994) (citation omitted). In other words, "the controlling factor in adoption and custody cases is not the natural parent's interest in raising the child, but rather what best serves the interest of the child." *In re No. 10941*, 335 Md. at 113; *see also In re Adoption/Guardianship of Ta'Niya C.*, 417 Md. 90, 111 (2010)("[W]hile the parental rights are recognized…the child's best interest standard trumps all other considerations.") (footnote omitted).

15

"In determining the child's best interests, the juvenile court is required to consider the statutory factors in [Maryland Code, Family Law] FL § 5-323(d)." *In re Jasmine D.*, 217 Md. App. at 734. Moreover, "[i]n cases where parental rights are terminated, it is important that each factor be addressed specifically not only to demonstrate that all factors were considered but also to provide a record for review of this drastic measure." *In re Adoption/Guardianship No. 87A262*, 323 Md. 12, 19-20 (1991). If, based on these factors, the court finds by clear and convincing evidence that the child's best interests are served by a termination of parental rights, the court may terminate said rights. *In re Jasmine D.*, 217 Md. App. at 734. As the Court of Appeals has explained:

> The court's role in TPR cases is to give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and, mindful of the presumption favoring a continuation of the parental relationship, determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child, and, if so, how. If the court does that – articulates its conclusion as to the best interest of the child in that manner – the parental rights we have recognized and the statutory basis for terminating those rights are in proper and harmonious balance.

*In re Rashawn H.*, 402 Md. at 501 (footnote and emphasis omitted).

The primary statutory factor the court must consider before terminating parental rights is "the health and safety of the child[.]" FL § 5-323(d). The other factors the court must consider are, in relevant part: (1) the nature and timeliness of the services offered by the Department to the parent; (2) the extent to which the parent has fulfilled his obligations under a social service agreement; (3) the parent's efforts in adjusting his circumstances,

16

condition, or conduct to make it in the child's best interest to be returned to the parent's care; (4) the extent to which the parent has maintained regular contact with the child, the child's caregiver, and the Department; (5) the parent's financial contributions to the child's well-being; (6) whether additional services would likely bring about a lasting parental adjustment so that the child could be returned to the parent within a reasonable time not to exceed 18 months from the date of placement unless the court finds that it would be in the child's best interests to extend the time period; (7) whether the parent has abused or neglected the child or another minor and the seriousness of the abuse or neglect; (8) the child's emotional ties with and feelings toward the parent and others who may affect the child's best interests; (9) the child's adjustment to community, home, placement, and school; and (10) the child's feelings about severing the parent-child relationship and the likely impact this severance would have on the child's well-being. *Id.*

In addition to being mandatory considerations prior to a termination of parental rights, the factors outlined in FL § 5-323 also serve "as criteria for determining the kinds of exceptional circumstances that would suffice to rebut the presumption favoring a continued parental relationship and justify termination of that relationship." *In re Rashawn H.*, 402 Md. at 499. Other criteria relevant to an exceptional circumstances determination include: the length of time that the child has been with his adoptive parents; the strength of the bond between the child and the adoptive parent; the relative stability of the child's future with the parent; the age of the child at placement; the emotional effect of the adoption on the child; the effect on the child's stability of maintaining the parental relationship; whether the parent abandoned or failed to support or visit with the child; and, the behavior

17

and character of the parent, including the parent's stability with regard to employment, housing, and compliance with the law. *In re No. A91-71A*, 334 Md. at 562-64.

Viewing the court's decision in light of the above legal principles, we hold that the juvenile court in the instant case did not err or abuse its discretion in terminating Father's parental rights. We are persuaded that the presumption favoring a continued parental relationship between Father and the Children was rebutted by clear and convincing evidence in the record.

Father resided in the United States illegally around the time D.A. and C.A. were born and was ultimately deported in 2010 following a domestic violence incident involving the Children's Mother. Rather than adjust his circumstances and make legal efforts to obtain entry into the United States, Father, by his own admission, made another illegal entry into the United States in 2013, this time bringing other individuals with him. That resulted in his arrest and eventual incarceration in federal prison, where he remained through the date of the hearing on October 11, 2016.

Thus, for the vast majority of the Children's lives, Father made little to no effort in adjusting his circumstances to make the Children's living situation better or become more involved in the Children's lives. Although his incarceration made such adjustments difficult, that incarceration did not commence until December of 2013, which was at least a year after he last saw the Children. During that time, the Children were subjected to unacceptable living conditions, neglect, and possible sexual abuse while in the care of their Mother. Father, according to the evidence, did nothing to remedy that situation. In fact,

18

other than Father's claim that he last saw the Children in 2012, there is little indication that he was even involved in the Children's lives at any time prior to his incarceration.

Father maintained minimal contact with the Children during his incarceration, and any sort of parental bond was virtually non-existent at the time of the hearing. Not surprisingly, the Children expressed no real desire to speak with him or maintain the relationship. Other than Father's insistence that he "loved" the Children, there was no indication of any meaningful bond with the Children. On the other hand, the Children had developed a strong bond with their foster mother, Melanie R., with whom they had lived for over a year. The Children were adjusting extremely well in her care, were safe and healthy, and were excited about the prospect of being adopted. While in Ms. R.'s care, the Children did well in school, took part in activities, and participated in therapy, which their therapist indicated was progressing well.

Father argues that the record fails to establish how retaining the parent-child relationship would be detrimental to the Children's best interests. We disagree. Not only did he show a consistent disregard for the law and a general inability and/or unwillingness to provide a safe and stable environment for the Children prior to his incarceration, he also showed a general lack of regard for the Children's best interest during their time in foster care. He stated several times that "no matter what" he was "going to get" the Children, despite the fact that he had no legal right to do so, and he even expressed a desire to live with Ms. R. and the Children following his release from prison, even though neither Ms.

R. nor the Children suggested that such an arrangement was feasible or desirable.[5]  Father also suggested that the Children could live with his "cousin" in California, even though he did not know the cousin's name or present any indication that this "cousin" was capable of caring for the Children.

At the time of the hearing, Father was incarcerated and would not be released until July of 2017, nine months after the hearing and almost three years after the Children's date of placement.  Moreover, Father was to be deported following his release, and there was no indication as to when or whether he would be able to come back to the United States to care for the Children.  Despite his insistence that he planned to reenter the United States legally, Father offered no explanation for how he would manage to do so.  In fact, Father admitted that he might not be able to come back into the country at all.

Father has taken no discernable steps toward ensuring that he would become more active in the Children's lives or how he planned to care for the Children following his release from prison and eventual deportation.  Father offered no feasible resources available to him in the United States, no explanation of what he would do upon his release or how he would manage to reenter the United States, and no evidence that he was capable

---

[5] Appellant argues that the court "clearly erred when it found that [appellant] acted inappropriately when he asked the foster mother if he could come live with her after he reenters the United States[.]"  We disagree, as such a suggestion, under the circumstances, was clearly inappropriate.  *See* www.merriam-webster.com/dictionary/inappropriate (defining "inappropriate" as "not right or suited for some purpose or situation").

of even sustaining a relationship with the Children, much less providing them with a safe and healthy environment.[6]

Meanwhile, both D.A. and C.A. expressed an eagerness to move on with their lives. And, after having been subjected to substandard living conditions for three years and then shuttled through the foster-care system for the next two, the Children were finally living in a stable, supportive, and healthy home with someone who is qualified and willing to adopt them. Clearly, any impediment to the Children's relationship with Ms. R., including maintaining a parent-child relationship between the Children and Father, would be detrimental to the Children's best interest. Conversely, severing what little relationship the Children and Father have will likely have no negative impact on the Children.

Father argues that, although the Children may have adjusted well to life with Ms. R., that fact cannot trump his liberty interest in maintaining his parental relationship with the Children. He also argues that the length of time they were out of his care cannot be treated as dispositive. While we agree, generally, with those statements, Father has conflated the issues and misrepresented the court's determination. The court did not terminate Father's parental rights based solely on the Children's relationship with Ms. R. or the amount of time they were in foster care. Rather, these were but two of many factors that the court considered in determining that it was in the Children's best interests to terminate their relationship with Father. And, as previously stated, a child's best interests

---

[6] Father's deportation status in this case is one factor in the best interests' analysis because it impacts his ability to care for the Children and to provide them with a safe and healthy environment now or in the foreseeable future. But deportation of an undocumented parent in and of itself is not a basis for termination of parental rights of otherwise fit parents.

21

*do* trump the parent's liberty interest in maintaining his relationship with a child. For these reasons, Father's reliance on *In re James G.*, 178 Md. App. 543, 603-04 (2008)(holding that the court's changing of a child's permanency plan was erroneous because the court failed to address the child's best interest while giving "paramount consideration" to the length of time the child was out of the parent's care); *Washington County Dept. of Soc. Serv. v. Clark*, 296 Md. 190, 197 (1983)(finding unconstitutional a Maryland statute that created a legal presumption that termination is in the best interest of the child when the child had been in foster care for two or more continuous years); and, *In re Adoption/Guardianship of Alonza D., Jr.*, 412 Md. 442, 468 (2010)(holding that the court's termination of parental rights was erroneous because "the judge focused primarily on the length of time [the children] had been in foster care and the apparent bond that had developed between [the foster parent] and the children" while at the same time failing to show "how a continued parental relationship would have caused a detriment to the children[.]") is misplaced.

Father also contends that the Department "did not do enough to provide him with services during his incarceration" and that "the services agreements did not meaningfully outline obligations for [him] to complete." Again, we disagree. As the court explained, pre-placement services were not offered to Father because he was incarcerated. When the Department spoke with Father about possible relative resources, he provided several names, all of which were investigated and ruled out by the Department.[7] Moreover, any

[7] Although appellant's mother was ultimately identified as a potential resource, she died before the hearing.

22

provision of services toward reunification would have been futile given that Father was incarcerated the entire time the children were in foster care. Nevertheless, the Department still provided the following services: including Father, via telephone, in certain meetings; securing the assistance of interpreters and translators; sending written documents, service agreements, letters, and court orders to Father in both English and Spanish; discussing service plans and court orders with Father; maintaining contact with Father by phone and mail service; and, making regular attempts to speak with Father and his case manager. The fact remains that no amount of services would have alleviated the primary obstacle to Father's ability to care for the children, namely, his incarceration and impending deportation. Under these circumstances, we are not persuaded that the juvenile court's determination that the Department's provision of services was reasonable was clearly erroneous.

Finally, Father avers that the evidence showed only that he could not take custody of the Children immediately, which he claims did not "have a direct bearing on whether the parental relationship should remain intact." On this point, *In re Adoption/Guardianship No. J970013*, 128 Md. App. 242 (1999) is instructive. There, the appellant, James L., fathered a child in 1991 while in prison. *Id.* at 245. At the time of the child's birth, James was serving a sentence of twenty years to life for first-degree murder. *Id.* at 246. In 1997, the Department of Social Services filed a petition to terminate James' parental rights, and a hearing on the petition was held in 1998. *Id.* at 246-47. The juvenile court ultimately ordered James' parental rights terminated because of his incarceration. *Id.* The court noted

23

that, while James was "coming up for" parole in "a couple of years," it was possible "that he could be in jail for the rest of his natural life." *Id.* at 249.

On appeal, James argued that the court erred in terminating his parental rights based on his incarceration.[8] *Id.* at 245. We disagreed, explaining that "[g]iven the appropriate set of factual circumstances…incarceration may indeed, under the facts of a particular case, be a critical factor in permitting the termination of parental rights, because the incarcerated parent cannot provide for the long-term care of the child." *Id.* at 252. Applying this principle to the facts of that case, we held that the juvenile court "was acting in the best interests of [the child] in terminating the parental rights of [James]." *Id.* at 253. We reasoned that such a finding was not clearly erroneous because, had James' parental rights remained intact, the child's status would be "placed in suspended animation until 2001 or even beyond waiting for [James'] potential for parole to be realized, an occurrence that the trial court noted may never come to be." *Id.* at 253.

This case presents a similar situation. Despite Father's claims that he planned to legally come back to the United States following his deportation, he recognized that his reentry may never happen. Therefore, not only was he unable to take care of the Children immediately, or even in the immediate future, there exists the very real possibility that he may never be able to enter the United States legally. This distinct possibility is made even

---

[8] Specifically, James claimed that the juvenile court erred "in finding that [his] incarceration was tantamount to a disability thus rendering him incapable of providing adequate care for his son[.]" *In re No. J970013*, 128 Md. App. at 245. Although we agreed that the incarceration of a parent does not necessarily constitute a disability, we found no support for James' claim in the record. *Id.* at 252.

24

more probable in light of the fact that Father made no known efforts at securing legal entry in the years between the Children's birth and his incarceration in 2013. As was the case in *In re No. J970013*, maintaining Father's parental rights under these circumstances would have placed the Children's status in a state of suspended animation until a future date that may never occur. We cannot say, therefore, that the trial court was clearly erroneous or abused its discretion in finding that terminating Father's parental rights was in the Children's best interest. *See In re No. 10941*, 335 Md. at 106(discussing Title 5 of the Family Law Article as being based on the premise "that it is in a child's best interest to be placed in a permanent home and to spend as little time as possible in foster care.").

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**