*E.N. v. T.R.*, No. 1231, September Term 2019.  Opinion by Beachley, J.

**DE FACTO PARENTHOOD—TWO LEGAL PARENTS—CONSENT BY ONE LEGAL PARENT**

Appellant E.N. ("Mother") and D.D. ("Father") are the biological parents of two minor children who were born in 2005 and 2007.  The four lived together until 2009, when Father was incarcerated.  Thereafter, the children lived with Mother and the maternal grandmother.

In late 2013, Father was released from prison, and began a relationship with appellee T.R.  Father and T.R. moved in together, and the children began visiting them "almost every weekend."  In 2015, Father and T.R. purchased a home together, and later that year the children moved in, partially because they wanted to spend more time with Father, but also because Mother needed a break "to get herself right."

The children continued to live with Father and T.R. until late 2017, when Father was again imprisoned.  Despite Father's incarceration, the children continued to live with T.R.

In November 2017, while T.R. and the children were visiting with the children's paternal grandparents, Mother appeared and demanded their return.  Police diffused the situation, and the children returned to T.R.'s home the following day.  Mother neither contacted nor saw the children again until September 2018.

In February 2018, T.R. filed a complaint for custody, essentially alleging that she was the children's "*de facto*" parent because the children had lived with her for the preceding three years, and had almost no contact with Mother during that time.  Mother filed a counter-complaint requesting sole legal and physical custody.  From prison, Father filed a document purporting to give T.R. "full custody" of the children.

Following a hearing, the circuit court concluded that T.R. was the *de facto* parent of the children even though it expressly found that Mother did not consent to or foster the relationship with T.R.  The court granted T.R. physical custody with joint legal custody to T.R. and Mother.  Mother then noted this timely appeal in which she claims that the circuit court erred because both legal parents must consent to and foster a parent-like relationship to create a *de facto* parent relationship with a third party.

*Held*: Judgment affirmed.

Although technically an issue of first impression in Maryland, the Court of Appeals has implicitly held that one parent may consent to the creation of a *de facto* parent relationship.  In *Conover v. Conover*, 450 Md. 51 (2016), a same-sex couple case, the Court

of Appeals for the first time recognized *de facto* parenthood in Maryland. Although there was only one biological parent in *Conover*, the Court of Appeals's holding in its most literal sense recognized that one legal parent's conduct could create a *de facto* parent relationship with a third party.

In her concurrence in *Conover*, Judge Watts interpreted the majority opinion to hold that "only one parent is needed to consent to and foster a parent-like relationship with the would-be *de facto* parent." *Id*. at 87-88. She expressed concern, however, that in cases with two biological parents, one biological parent could unilaterally consent to and foster a *de facto* parent relationship without any knowledge by the other legal parent. In this case, we adopt Judge Watts's interpretation of the majority opinion in *Conover*.

Additionally, recognition of T.R.'s *de facto* parenthood will not infringe on Mother's fundamental rights because once T.R. achieved *de facto* parent status, she had co-equal fundamental constitutional rights with Mother.

Finally, the circuit court did not abuse its discretion in awarding T.R. primary physical custody where the court found that T.R. is a "wonderful mother," that Mother's request for custody seemed insincere, that the children felt that Mother abandoned them and instead viewed T.R. as their "real" mother, and that T.R. is an integral part of the children's lives.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1231

September Term, 2019

_____

E.N.

v.

T.R.

_____

Kehoe,
Beachley,
Shaw Geter,

JJ.

_____

Opinion by Beachley, J.

_____

Filed: August 25, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This case presents the precise issue that Judge Watts presciently recognized in her concurring opinion in *Conover v. Conover*, 450 Md. 51 (2016): Where there are two legal parents,[1] may only one parent consent to and foster a parent-like relationship so as to create a *de facto* parent relationship with a third party? Stated another way, where there are two extant legal parents, must both legal parents consent to and foster the creation of a *de facto* parent relationship with a third party? We shall hold that a *de facto* parent relationship may be established by the conduct of only one legal parent. We shall further hold that the trial court here did not err in awarding primary physical custody of the children to the *de facto* parent.

## FACTUAL AND PROCEDURAL BACKGROUND

Because appellant E.N. ("Mother") does not challenge the circuit court's fact-findings, we recount the relevant facts from the trial court's memorandum opinion. Mother and D.D. ("Father") are the biological parents of two minor children who were born in 2005 and 2007. Mother and Father lived together with the children from 2005 until Father was incarcerated on drug charges in October 2009. After Father was incarcerated, Mother and the children lived with the maternal grandmother.

Father was released from prison in late 2013. Around this time, he began a relationship with appellee T.R. and the two moved in together. The children began visiting with Father and T.R. "almost every weekend."

---

[1] In this opinion, we shall refer to a biological or adoptive parent as a "legal parent."

In 2015, Father and T.R. purchased a home together. Later that year the children moved in with Father and T.R., primarily because the children wanted to spend more time with Father. In order to facilitate the move, Mother signed paperwork to permit the children to transfer from the school they had been attending to a school in Father's school district. Mother agreed to this arrangement, testifying that she needed a break "to get herself right."

The children continued to live with Father and T.R. until late 2017, when police raided their home and discovered several firearms, ammunition, and a "significant amount" of cocaine. Father was ultimately convicted of drug distribution and related firearms violations, resulting in ten years' imprisonment. He is scheduled to be released in August 2024. From June 2015 to late 2017, Mother only saw the children once, in the spring of 2017 when she took the children out to dinner with their grandparents.

After Father's incarceration in 2017, the children continued to live with T.R. In November 2017, while T.R. and the children were visiting with the children's paternal grandparents, Mother appeared at the grandparents' home and asked for the return of her children. T.R. refused. The police ultimately arrived to defuse the situation. The children stayed the night at the paternal grandparents' home, but returned to T.R.'s home the following day. Mother did not see or have contact with the children again until September 2018.

On February 16, 2018, T.R. filed a complaint for custody, essentially alleging that she was the children's "*de facto*" parent because the children had lived with her for the

2

preceding three years during which they had no contact with Mother.[2]  Mother filed a counter-complaint requesting sole legal and physical custody of the children.  Although Father was named as a defendant in T.R.'s complaint, he never formally answered the complaint.  Instead, Father filed a document purporting to give T.R. "full custody" of the children.

The case proceeded to trial on September 13, 2018.  Because T.R. was unable to complete her case in chief on September 13, the court scheduled the case for completion on November 19–20, 2018.  In light of the approximately two-month delay to resume the trial, the circuit court issued a *pendente lite* order granting Mother visitation with the children every other weekend "until the November 19 and 20, 2018 hearings."  After the November merits hearing, the court continued the *pendente lite* visitation order while the court held the matter *sub curia*.[3]  On July 2, 2019, the court issued a Memorandum Opinion and Order in which it concluded that T.R. was the *de facto* parent of the children, and granted "sole physical custody" to T.R. and joint legal custody to T.R. and Mother.  Mother noted this timely appeal.

---

[2] T.R.'s complaint did not expressly reference the term "*de facto* parent."

[3] The court also granted Mother Christmas visitation.

**DISCUSSION**

**I**

A. ONE LEGAL PARENT MAY CREATE A *DE FACTO* PARENT RELATIONSHIP BY CONSENTING TO AND FOSTERING A PARENT-LIKE RELATIONSHIP BETWEEN THE PUTATIVE *DE FACTO* PARENT AND THE CHILD

A *de facto* parent, sometimes referred to as a "psychological parent" in other jurisdictions, is a person who is not a child's biological or adoptive parent but who has a parent-like relationship with the child. *Conover*, 450 Md. at 62, 68 n.12. To establish *de facto* parenthood, the Court of Appeals has adopted the four-part test from *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 421 (Wis. 1995). That test requires a putative *de facto* parent to prove:

(1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child;

(2) that the petitioner and the child lived together in the same household;

(3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and

(4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Conover*, 450 Md. at 74 (quoting *H.S.H.-K.*, 533 N.W.2d at 435–36).

In her appeal, Mother challenges only the circuit court's determination as to the first element of the *H.S.H.-K* test. Specifically, she argues that the circuit court erred in construing the first element of the *H.S.H.-K* test by finding the existence of a *de facto* parent

4

relationship based on the conduct of only one legal parent. Instead, Mother contends that

when a child has two extant legal parents a *de facto* parent relationship cannot be created,

as a matter of law, unless both legal parents consent to and foster the relationship between

the child and the putative *de facto* parent. Thus, Mother contends that the circuit court's

express finding that Mother did not consent to and foster a *de facto* relationship between

the children and T.R. precludes T.R. from being a *de facto* parent.[4]

Because this is a purely legal issue, we review the circuit court's decision *de novo*.

*Conover*, 450 Md. at 60.

We begin with *Conover*, the seminal case in Maryland concerning *de facto*

parenthood. Although *Conover* did not involve two legal parents and a putative *de facto*

parent, the Court of Appeals's decision, and particularly Judge Watts's concurrence,

provide some guidance in resolving the issue before us. There, "Michelle and Brittany

---

[4] The trial court found that Mother did not consent to T.R.'s parent-like relationship with the children, but based that finding on the principle that a *de facto* parent relationship may not be created through implied consent. The court stated, "Implied consent does not meet the burden needed to satisfy prong one of the *Conover* test. . . . [T]he consent needs to be express and explicit." Maryland appellate courts have not decided whether consent may be implied. To the extent the parties raised this issue, we need not resolve it here. We note, however, that other jurisdictions are divided on this issue. *Compare, e.g., K.W. v. S.L.*, 157 A.3d 498, 507 (Pa. Super. Ct. 2017) (holding that consent may not be implied, but may be found when a parent "act[s] in a manner consistent with consent"), *with K.A.F. v. D.L.M.*, 96 A.3d 975, 985 (N.J. Super. Ct. App. Div. 2014) ("A parent's 'consent' to the creation of a psychological parent bond need not be explicit.").

5

Conover began a relationship in July 2002."[5]  *Id.* at 55 (footnote omitted).  The two agreed

that Brittany would be artificially inseminated, and in 2010, she gave birth to a son.  *Id.*

The birth certificate listed Brittany as the child's mother, but did not identify anyone as the

father.  *Id.*  The parties married approximately six months after the child's birth.  *Id.*  A

year later, however, the parties separated, and, in July 2012, Brittany ceased allowing

Michelle overnight and weekend visitation access.  *Id.*  After Brittany filed a complaint for

absolute divorce, Michelle responded by filing an answer and a counter-complaint, both of

which sought visitation rights.  *Id.*  In denying Michelle's request for visitation, the circuit

court determined that she lacked parental standing to seek visitation.  *Id.* at 57.  Although

the circuit court concluded that Michelle was a *de facto* parent, it noted that in *Janice M.

v. Margaret K.*, 404 Md. 661 (2008), the Court of Appeals declined to recognize *de facto*

parent status.  *Conover*, 450 Md. at 58.  Accordingly, the circuit court denied Michelle's

request for visitation based on a lack of standing.  *Id.*

 The Court of Appeals overruled *Janice M.* because it was "clearly wrong," and held

"that *de facto* parenthood is a viable means to establish standing to contest custody or

visitation."  *Id.* at 59, 66.  In so holding, the Court, after acknowledging its departure from

stare decisis, *id.* at 66, nevertheless recognized *de facto* parenthood in Maryland by

adopting the *H.S.H.-K.* test, *id.* at 75.  The Court then reversed and remanded, instructing

---

[5] In a footnote, the Court of Appeals noted that, by the time it issued its decision, Michelle began living as a transgender man and had changed his name.  *Conover*, 450 Md. at 55 n.1.  In order to be consistent with the record, the Court referred to him as "Michelle" and used female pronouns.  *Id.*  For consistency, we shall follow the Court's footsteps in referring to Michelle Conover.  We intend no disrespect in doing so.

6

the circuit court to apply the *H.S.H.-K.* standards to determine whether Michelle could be considered the child's *de facto* parent. *Id.* at 85.

In its most literal sense, *Conover* held that the conduct of one legal parent could create a *de facto* parent relationship between a third party and a child. But because there was only one legal parent in *Conover*, the Court was not required to, and indeed did not, address the issue presented here.[6] In her concurring opinion, however, Judge Watts recognized the implications of broadly construing the majority's holding, foreseeing the precise issue presented here:

> By adopting the four-factor test set forth in *H.S.H.-K.*, 533 N.W.2d at 435, the Majority holds that, under the first factor, when seeking *de facto* parent status, the third party must show "that the biological or adoptive parent consented to, and fostered, the [third party]'s formation and establishment of a parent-like relationship with the child[.]" *In other words, the Majority holds that only one parent is needed to consent to and foster a parent-like relationship with the would-be de facto parent.* This will work in cases such as this one, where a second biological or adoptive parent does not exist, *i.e.*, where there is only one existing parent. Where there are two existing parents, however, permitting a single parent to consent to and foster a *de facto* parent relationship could result in a second existing parent having no knowledge that a *de facto* parent, *i.e.*, a third parent, is created.

---

[6] Maryland appellate courts have not yet expressly considered the implications of a *de facto* parenthood case involving two legal parents and a putative *de facto* parent. In all but one of our prior *de facto* parent cases, the children only had one legal parent. The exception is *Kpetigo v. Kpetigo*, 238 Md. App. 561, 565–66 (2018), where a biological father and his ex-wife each sought custody of a child whose biological mother was living in the Ivory Coast, but who did not participate in the custody action. This Court rejected the father's contention that *Conover* recognized *de facto* parenthood only for same-sex couples, holding that the ex-wife established a *de facto* parent relationship with the child. Although the Court found that the father consented to and fostered the relationship, the issue presented here—whether both legal parents must consent to and foster the *de facto* relationship—was not before the *Kpetigo* Court. Nevertheless, by affirming the existence of a *de facto* relationship in the absence of any evidence of the biological mother's consent, the Court did not require both legal parents' consent to create a *de facto* parent relationship.

*Conover*, 450 Md. at 87–88 (Watts, J., concurring) (emphasis added). We will revisit the significance of Judge Watts's concurring opinion *infra*.

Intermediate appellate courts in two other states that have adopted the *H.S.H.-K.* test, New Jersey and Washington, have expressly considered the situation presented here and reached different conclusions. The Superior Court of New Jersey interpreted the language of the *H.S.H.-K.* test to require the consent of only a single legal parent. In *K.A.F. v. D.L.M.*, 96 A.3d 975, 977 (N.J. Super. Ct. App. Div. 2014), a child, Arthur, was conceived by K.A.F. through artificial insemination. K.A.F.'s partner, F.D., adopted Arthur. *Id.* K.A.F. and F.D. later ended their relationship and K.A.F. became romantically involved with D.M. *Id.* at 977–78. K.A.F. allegedly consented to and fostered D.M.'s parent-like relationship with Arthur, but F.D. was opposed to the relationship. *Id.* at 978. After K.A.F. and D.M. ended their relationship, D.M. sought custody and visitation of Arthur, which both K.A.F. and F.D., the legal parents, opposed. *Id.* The trial court dismissed D.M.'s claim based on F.D.'s consistent opposition to D.M.'s parent-like relationship with Arthur, concluding that "where there are two fit and involved parents, both must have consented to the creation of a psychological parent relationship before a third party can maintain an action for visitation and custody based on the existence of that relationship." *Id.* New Jersey's intermediate appellate court disagreed with the trial court's interpretation, stating: "We fail to perceive any basis for this argument either in the law or the policies underlying the concept of a psychological parent." *Id.* at 979. The court recognized that "it would be difficult to ignore the 'psychological harm' a child might suffer because he is deprived of the care of a psychological parent simply because only one

8

of his 'legal parents' consented to the relationship." *Id.* at 981. Additionally, the court found the wording of the *H.S.H.-K.* test and the New Jersey Supreme Court's discussion of that test informative:

> The Court's continual reference to "a" legal parent or "the" legal parent in the singular strengthens our conclusion that the consent of both legal parents is not required to create a psychological parent relationship between their child and a third party.

> Nothing in the historical development of the psychological parent policy, in the policy itself, or in the language of the Court, therefore, suggests that both legal parents must consent before a court may consider a claim of psychological parenthood by a third party. Rather, it is sufficient if only one of the legal custodial parents has consented to the parental role of the third party. In that circumstance, a legal custodial parent has voluntarily created the relationship and thus has permitted the third party to enter the zone of privacy between her and her child.

*Id.* at 982–83. The court recognized "the importance of F.D.'s 'consent,' or lack thereof," as a factor in the overall analysis, but noted that "in most cases, the longer and more established the parental role of a third party has become, the lack of consent by one legal parent would diminish in analytical significance." *Id.* at 983.[7]

The Washington Court of Appeals reached a different conclusion, holding that the doctrine of *de facto* parenthood "may be extended to a stepparent of a child with two legal parents . . . if the stepparent petitioner establishes . . . that both legal parents consented to the stepparent being a parent to the child." *In re Parentage of J.B.R.*, 336 P.3d 648, 649–50 (Wash. Ct. App. 2014) (emphasis removed). That court nevertheless found that both

---

[7] Because the trial court "dismissed D.M.'s complaint on a motion for summary judgment," *K.A.F.*, 96 A.3d at 977, the court remanded the case for a plenary hearing, *id.* at 984.

9

parents there had consented to the *de facto* relationship: the mother expressly consented to the relationship, and the father was deemed to have consented by "voluntarily absent[ing] himself" from the child's life. *Id.* at 654 ("The biological father's decision not to support J.B.R. and not to seek a relationship with his daughter for more than a decade clearly evidences his consent for [the *de facto* parent] to establish a parent-child relationship with J.B.R.").[8]  The divergent views taken by the New Jersey and Washington courts substantiate the important competing interests that make resolution of this case challenging.

As Maryland's intermediate appellate court, we aspire to discern how the Court of Appeals would resolve this issue of first impression. In our view, Judge Watts's concurring opinion in *Conover* provides the best guidance available. In her concurring opinion, joined by Judge Battaglia, Judge Watts interpreted the majority opinion to hold that "only one parent is needed to consent to and foster a parent-like relationship with the would-be *de facto* parent." *Conover*, 450 Md. at 87–88 (Watts, J., concurring). Judge Watts articulated the concern that Mother raises here, stating, "[w]here there are two existing parents, however, permitting a single parent to consent to and foster a *de facto* parent relationship could result in a second existing parent having no knowledge that a *de facto* parent, *i.e.*, a third parent, is created." *Id.* at 88. She continued, "The majority opinion, however, will

---

[8] *See also Middleton v. Johnson*, 633 S.E.2d 162, 169 (S.C. Ct. App. 2006) (noting in dicta that "when both biological parents are involved in the child's life, a third party's relationship with the child could never rise to the level of a psychological parent, as there is no parental void in the child's life").

10

have greater consequences in cases for children with two existing parents because a *de facto* parent request may occur without the knowledge or consent of the second existing parent." *Id.*[9]

We recognize that an interpretation of a majority opinion by a concurring (or dissenting) member of a court is not binding because a majority of the court has not placed its imprimatur on that interpretation. We also recognize that Judge Watts's concurring opinion was likely circulated to the entire Court prior to publication.[10] *See generally*, Igor Kirman, *Standing Apart to Be a Part*: *The Precedential Value of Supreme Court Concurring Opinions*, 95 Colum. L. Rev. 2083, 2101–04 (1995) (discussing the circulation of drafts in the Supreme Court). That the Majority did not respond to Judge Watts's specific and substantive concerns provides us at least some evidence that the Court of Appeals did not disagree with her interpretation of the majority opinion. Indeed, it is not uncommon for the Court of Appeals's majority opinion to respond to issues raised in concurring and dissenting opinions. *See, e.g., Barclay v. Castruccio*, ___ Md. ___, No. 30,

---

[9] The concurring opinion specifically expressed the concern that allowing one legal parent to create a *de facto* parent relationship "may result in a child having three parents vying for custody and visitation, and being overburdened by the demands of multiple parents." 450 Md. at 88. Although Judge Watts agreed with the majority opinion in the context of the same-sex couple presented in that case, she noted that "the Majority expresses no concern about the creation of a single *de facto* parentship where there are already two existing parents, and where one parent may create a *de facto* parentship absent the other existing parent's notice of, and consent to, the *de facto* parentship of a third party." *Id*.

[10] *See* Court of Appeals, Court Overview, *Inner Workings of the Court of Appeals of Maryland*, https://mdcourts.gov/coappeals/coaoverview (last visited August 8, 2020) ("After a predetermined period of time has passed for the judges to study the proposed majority and dissenting opinions, the court holds a 'case' conference (at least once monthly) and considers all proposed opinions then scheduled for final disposition.").

11

Sept. Term 2019, slip op. at 7 n.15 (filed June 30, 2020) (disagreeing with concurring opinion's suggestion "that a 'relationship' is not required in the inheritance interference tort set forth in § 19 of the Third Restatement."); *Small v. State*, 464 Md. 68, 87 n.21 (2019) (stating that the majority opinion was not, as the concurring opinion suggested, "dismiss[ing] decades of extensive social science research" regarding the reliability of eyewitness identification (alteration in original)); *Sizer v. State*, 456 Md. 350, 371 n.4, 374 n.6 (2017) (disagreeing with the concurring/dissenting opinion's characterization of the hearing judge's conclusion of law, and challenging the concurring/dissenting opinion's characterization of a "hard take-down").

Accordingly, we hold that a *de facto* parent relationship can be created by only one legal parent consenting to and fostering a parent-like relationship with a putative *de facto* parent. The circuit court therefore did not err in concluding that T.R. was the *de facto* parent of the children based on Father's conduct in creating a parent-like relationship between T.R. and the children.[11]

## B. A *DE FACTO* PARENT HAS A CO-EQUAL FUNDAMENTAL CONSTITUTIONAL RIGHT WITH LEGAL PARENTS CONCERNING CARE AND CONTROL OF A CHILD

Mother additionally argues that recognizing T.R. as a *de facto* parent infringes on her constitutional fundamental rights as a parent. Although the Supreme Court has not considered the fundamental rights of parents vis-à-vis *de facto* parents, in *Troxel v.*

---

[11] We note that, even were we to apply the Washington Court of Appeals's analysis to this case, the same result would likely abide. The factual record arguably manifests Mother's implied consent where she "voluntarily absented [her]self from [the children's lives], thus consenting to and fostering a relationship between [the children] and the petitioning party." *In re Parentage of J.B.R.*, 336 P.3d at 654.

*Granville*, 530 U.S. 57 (2000), the Court discussed the fundamental rights of parents in relation to third parties. It concluded that a Washington statute allowing *any* third party to petition the court for visitation of a child at *any* time was unconstitutional. *Id.* at 67. The Court's opinion focused largely on the overbreadth of the statute, and did not make any specific pronouncements concerning the constitutionality of custody and visitation laws. *Id.* at 73. The Court simply held that the trial court's grandparental visitation order was an unconstitutional infringement on the parent's "fundamental right to make decisions concerning the care, custody, and control" of her children under the Due Process Clause. *Id.* at 72.

*Conover* recognized that "*Troxel* was an extremely narrow decision" that was "hinged 'on the sweeping breadth' of the Washington statute and 'the application of that broad, unlimited power.'" 450 Md. at 70 (quoting *Troxel*, 530 U.S. at 73). The Court of Appeals noted that "several state courts of last resort have expressly held that *Troxel* does not prevent the recognition of *de facto* parent status." *Id.* at 71. Our reading of *Troxel* likewise leads us to conclude that the Supreme Court did not hold that recognition of *de facto* parenthood infringes on the due process interests of biological or adoptive parents. More importantly, the *Conover* Court's approval of the following quote from *Smith v. Guest*, 16 A.3d 920, 931 (Del. 2011) leaves little doubt that the Court of Appeals sees no constitutional impediment in this regard:

> *Troxel* does not control these facts. The issue here is not whether the Family Court has infringed Smith's fundamental parental right to control who has access to ANS [the minor child] by awarding Guest co-equal parental status. Rather, the issue is whether Guest is a legal "parent" of ANS who would also have parental rights to ANS—rights that are co-equal to

13

> Smith's. This is not a case, like *Troxel*, where a third party having no claim to a parent-child relationship (e.g., the child's grandparents) seeks visitation rights. **Guest is not "any third party." Rather, she is a [] *de facto* parent who . . . would also be a legal "parent" of ANS.** Because Guest, as a legal parent, would have a co-equal "fundamental parental interest" in raising ANS, allowing Guest to pursue that interest through a legally-recognized channel cannot unconstitutionally infringe Smith's due process rights. In short, Smith's due process claim fails for lack of a valid premise.

450 Md. 71–72 (alterations in original). The *Conover* Court then concluded, "Put simply, numerous courts have declined to treat *Troxel* as a bar to recognizing *de facto* parenthood or other designations used to describe third parties who have assumed a parental role." *Id.* at 72. We also note that in *In re Guardianship of Victoria R*., 201 P.3d 169, 178 (N.M. Ct. App. 2008), a case cited by the *Conover* majority, the Court of Appeals of New Mexico stated, "To our knowledge, the United States Supreme Court has never recognized a fundamental right of biological parents to engage in off-again, on-again parenting without regard to the effects this pattern of parenting has on children." The *Victoria R.* court concluded that "Mother does not have an unqualified constitutional right to terminate at her whim the stable, nurturing parent-child relationship that naturally and foreseeably arose between Child and Petitioners during the period that Mother was unwilling or unable to care for Child." *Id.*

We recognize that *Conover* did not expressly address the issue Mother raises, *i.e.*, whether recognition of T.R.'s *de facto* parenthood infringed upon Mother's fundamental rights where Mother neither consented to nor fostered the *de facto* relationship. Nevertheless, we are confident that the Court of Appeals would find no constitutional infringement on Mother's due process rights because, once T.R. achieved *de facto*

14

parenthood status, T.R. qualified as a "legal parent" entitled to co-equal fundamental constitutional protections. In our view, such a rule strikes the proper balance between parents' fundamental rights to care for their children and the children's fundamental rights to be placed with caregivers who will promote their best interests. *Cf. In re O.P.*, 240 Md. App. 518, 568 (2019) ("[A]s important an interest as parents have in raising their children, it is not absolute. . . . '[T]he best interests of the child may take precedence over the parent's liberty interest.'" (quoting *In re Mark M.*, 365 Md. 687, 706 (2001))), *rev'd on other grounds*, ___ Md. ___, No. 26, Sept. Term 2019 (filed Aug. 14, 2020); *In re Adoption/Guardianship of C.A. and D.A.*, 234 Md. App. 30, 54 (2017) ("[A] child's best interests *do* trump the parent's liberty interest in maintaining his relationship with a child.").

## II

Finally, Mother argues that the circuit court abused its discretion in granting T.R. custody of the children because T.R. "either purposely or negligently contributed to [Mother's] lengthy absence from the children's lives." Although Mother appeared to concede this issue in a colloquy with the Court during oral argument, we shall briefly consider the trial court's best interest analysis and determination.[12]

An appellate court will only rarely find an abuse of discretion on a custody issue. *Gizzo v. Gerstman*, 245 Md. App. 168, 201 (2020). "An abuse of discretion may occur

---

[12] In response to a question from the Court if the only issue in the appeal was the "legal issue" regarding whether both parents must consent to and foster a *de facto* parent relationship, Mother's counsel emphatically and unequivocally answered in the affirmative.

15

when no reasonable person would take the view adopted by the trial court, or when the court acts without reference to any guiding rules or principles, or when the ruling is clearly against the logic and effect of facts and inferences before the court." *Id.*

"Child custody and visitation decisions are among the most serious and complex decisions a court must make, with grave implications for all parties." *Id.* at 199 (quoting *Conover*, 450 Md. at 54). Consequently, courts weigh many "best interests" factors before making such a decision, including:

> 1) fitness of the parents, 2) character and reputation of the parties, 3) desire of the natural parents and agreements between the parties, 4) potentiality of maintaining natural family relations, 5) preference of the child, 6) material opportunities affecting the future life of the child, 7) age, health and sex of the child, 8) residences of parents and opportunity for visitation, 9) length of separation from the natural parents, and 10) prior voluntary abandonment or surrender.

*Montgomery Cty. Dept. of Soc. Servs. v. Sanders*, 38 Md. App. 406, 420 (1977) (citations omitted). In *Taylor v. Taylor*, 306 Md. 290, 304–11 (1986), the Court of Appeals provided thirteen additional factors for consideration in custody disputes, some of which overlap with the *Sanders* factors. These factors are: 1) the capacity of the parents to communicate, 2) willingness to share custody, 3) fitness of the parents, 4) relationship established between the child and each parent, 5) preference of the child, 6) potential disruption of the child's social and school life, 7) geographical proximity of the parental homes, 8) demands of parental employment, 9) age and number of children, 10) sincerity of the parents' requests, 11) financial status of the parents, 12) impact on state or federal assistance, and 13) benefit to the parents. *Id.* Because each case hinges on a plethora of unique facts

16

relating to these factors, "[t]here can be very little constructive or useful precedent on the subject of custody determinations." *Sanders*, 38 Md. App. at 419.

In its best interests analysis, the trial court expressly considered each of the *Taylor*/*Sanders* factors. We highlight some of the salient findings, none of which Mother challenges on appeal:

- T.R. is a "wonderful mother," while Mother "needs advice and guidance on daily parenting responsibilities."

- Although T.R.'s request for custody is sincere, "the [c]ourt is less than convinced of [Mother's] sincerity."

- The children expressed clear preference to live with T.R., and they told the court that "they felt abandoned by their mother" and saw T.R. as "their 'real' mother."

- The children have developed friendships "in the neighborhood and school" while living with T.R., and they are thriving in school with T.R.'s assistance. Mother, on the other hand, "has trouble knowing and obtaining information about the children's activities," and "does not assist the . . . children with their homework."

- T.R. is an "integral part" of the children's lives and the "children have bonded and established a parent-child relationship with her."

As noted, Mother does not challenge these findings on appeal. Moreover, Mother has not directed our attention to any evidence that T.R. "purposely or negligently contributed to [Mother's] lengthy absence from the children's lives," nor did the court make any finding related to that allegation.

We commend the trial court for its thorough review of the relevant custody factors, and discern no abuse of discretion in the court's decision to award primary physical custody of the children to T.R.

17

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**