NOT DESIGNATED FOR PUBLICATION

No. 128,991

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of L.X.-Y. and G.R.-X.,
Minor Children.

MEMORANDUM OPINION

Appeal from Ford District Court; LAURA H. LEWIS. Submitted without oral argument. Opinion filed January 9, 2026. Reversed and remanded with directions.

*Laura E. Poschen*, of Poschen Law, LLC, of Wichita, for appellant natural mother.

*Eliza Kassebaum*, deputy county attorney, and *Sarah Doll Heeke*, guardian ad litem, for appellee.

Before PICKERING, P.J., SCHROEDER and HURST, JJ.

PER CURIAM: This is an appeal from the district court's order terminating a mother's parental rights following the mother's involuntary deportation. In terminating Mother's rights, the district court improperly relied solely on the State's proffer. Therefore, the court's decision is reversed, and this matter is remanded as directed herein.

FACTUAL AND PROCEDURAL BACKGROUND

Y.X.-Y. (Mother) is the natural parent of L.X-Y. (2018), a Guatemalan citizen, and G.R.-X. (2020), a United States citizen. On January 10, 2024, the Department for Children and Families (DCF) received a report that Mother was arrested for driving without a license in the State of Georgia, placed in a detention facility, and subsequently deported to Guatemala. Before her deportation, Mother arranged for her children to be

1

cared for by a friend (J.L.) residing in Dodge City. DCF assisted Mother with obtaining a temporary guardianship for J.L. With the temporary guardianship, J.L. obtained immunizations for L.X-Y. and enrolled him in school and obtained birth certificates for both children and G.R.-X.'s social security card. G.R.-X. was not yet old enough for grade school.

On March 21, 2024, J.L. informed DCF that L.X-Y. broke his arm. Because L.X-Y. was not a citizen of the United States, J.L. could not obtain medical insurance for him through the State. Therefore, L.X-Y. needed medical care that J.L. could not financially afford because the child lacked health insurance due to his immigration status. J.L. cared for the children as best she could, but DCF was concerned that her limited financial resources and lack of permanent legal guardianship made her unsuitable to provide long-term care for the children.

On March 26, 2024, the State, through the deputy Ford County attorney, filed an application for an ex parte order of protective custody on behalf of the children in Ford County District Court. The application alleged that an emergency existed that threatened the safety of the children and efforts to maintain the children in the home were not reasonable. It stated: "Children are stuck in U.S. without identifying documents or long term care because parents are not in the U.S. and/or are unable to be located at this time."

The district court filed an ex parte order of protective custody the same day and made findings based on the State's application and the accompanying affidavit completed by DCF. The affidavit stated, "The parents are not in the United States and therefore have abandoned these children as they cannot enter the United States to provide care for them legally." The district court found that the children needed to be removed from the home because "[n]either parent is present in Ford County to care for children that have been left with a friend without documentation or funds to care for them."

2

The affidavit stated DCF previously interacted with Mother and the children in Dodge City when Mother and G.R.-X.'s father were arrested after a domestic incident involving alcohol about four years earlier. Following the incident, the children were placed in police protective custody with J.L. DCF later recommended the children return home to Mother. A Child in Need of Care (CINC) case was filed for each of the children, but the cases were dismissed, and the children returned home two days after the incident.

The State's affidavit also noted that this was Mother's second deportation, with the first occurring in 2022 following a driving under the influence (DUI) charge in Alabama. At that time, the children went into foster care through the State of Alabama, though Mother subsequently reentered the United States, worked on a reintegration plan, and was reintegrated with her children in January 2023. The new case stems from an incident in October 2023, when Mother was arrested for driving without a license and detained pending deportation.

The Ford County District Court held a temporary custody hearing on March 27, 2024. Though it appears that notice of the hearing was sent to DCF, there is no record of Mother being sent the notice of the hearing, as no address is listed for Mother. The Certificate of Oral Notice of Temporary Custody Hearing states that DCF and Saint Francis Ministries (St. Francis) received notice via email. Mother did not appear in person, and no attorney was present to represent her at the temporary custody hearing.

At the temporary custody hearing, the State asserted that Mother was in Guatemala and that the children's fathers were likely in Mexico. The State proceeded by proffer. The State argued the children were abandoned and there was no one to care for them. The children's guardian ad litem (GAL) did not disagree with the State's assessment but added that the children were "voluntarily placed" with J.L. with Mother's consent—Mother had not abandoned the children but had found substitute care while she was out of the country. The GAL then said, "[G]iven the status of at least one of the

3

children, it can't be appropriate substitute care that meets the needs of the child, especially given the medical situation that's happening."

The district court noted there was no petition on file at the time of the temporary custody hearing, though the State asserted it was filed. The district court found there was probable cause to find the children were CINC based on the State's proffer, and it ordered the children into DCF custody and gave DCF discretion for placement. The children remained in the physical custody of Mother's friend, J.L.

*CINC case and reintegration plan*

Mother attended a worker/parent visit on April 9, 2024, as well as the initial case plan meeting three days later, by telephone. A reintegration plan was developed during the initial case plan meeting. The reintegration plan tasks for Mother included: (1) completing a mental health assessment and following recommendations; (2) remaining in contact with St. Francis; (3) taking part in a parenting class with a discipline component; (4) completing a drug and alcohol assessment and following all recommendations; and (5) providing a safe and stable home for her children. These reintegration tasks remained unchanged throughout the duration of the case.

After Mother was appointed an attorney, an adjudication hearing was scheduled for July 17, 2024, and notice was sent to Mother's attorney, the GAL, and the State's attorney, with copies to J.L., St. Francis, and DCF. Mother was not present at the hearing, but she was represented by counsel. It was noted that St. Francis had been in contact with Mother through WhatsApp. With Mother and the children's fathers absent, the State proceeded by proffer. Based on the State's proffer—and the court report admitted into evidence—the district court found clear and convincing evidence that the children were without adequate parental care, control, or subsistence, and the condition was not due solely to the lack of financial means of the children's parents or other custodian. The

4

district court also found the children had been abandoned because "Mother ha[d] been deported and last known location for fathers was outside the U.S." The district court stated that the "[p]roposed permanency plan is adoption since parents are unable to work reintegration case plan," and that the State "will file a termination motion."

Less than four months after the reintegration plan meeting, the State filed a CINC petition on August 5, 2024, alleging the children were in need of care due to abandonment and due to being without adequate parental care, control, or subsistence, not due solely to the lack of financial means of the parents or other custodian. No certificate of service accompanied the CINC petition. It appears the State erroneously believed the CINC petition had been filed earlier, but when it realized it had not the CINC petition was filed just days before the motion to terminate parental rights. Four days after the State filed the CINC petition the State filed a motion to terminate the parental rights of Mother and the alleged fathers. The motion alleged Mother was unfit based on three statutory factors: K.S.A. 38-2269(b)(7)—failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; K.S.A. 38-2269(b)(8)—lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child; and K.S.A. 38-2269(c)(2)—failure to maintain regular visitation, contact, or communication with the child or with the custodian of the child.

The Certificate of Service accompanying the motion to terminate stated Mother would be notified "pursuant to statute." On the accompanying Notice of Termination Hearing, the attached Report of Service document indicates that the notice was mailed to J.L., St. Francis, and DCF.

*Months leading up to the termination hearing*

On September 12, 2024, the State filed a Request for Notice by Publication and Affidavit. The request asserted that "[d]uly diligent efforts have been made to ascertain the residence of the father and mother, but have proven unsuccessful: Mother was deported and left children with a friend and has never attended a Court hearing or worked on case plans." On September 13, 2024, the district court entered an Order for Service by Publication pursuant to K.S.A. 38-2237, ordering notice to be published in the Dodge City Daily Globe. An Amended Notice of Hearing was filed on November 6, 2024, stating a location change had taken place, but the accompanying certificate of service states that the amended notice was only filed electronically. On November 19, 2024, a Certificate of Publication was filed by the State, showing proof of two publications in the Dodge City Globe—though both of those publications provided the original location of the hearing, which was inaccurate.

*First attempt at a termination hearing*

The court held the first setting of the termination hearing on December 3, 2024. Neither Mother nor the fathers appeared, but they were represented by counsel. The State began by stating that Mother had attempted to come back to the United States with no success. After being deported to Guatemala Mother made her way to Mexico and lived there during much of the proceedings. The guardian ad litem was able to speak to Mother, who wanted to do everything to keep her rights intact, including if that meant reintegrating with the children while she was in Mexico. The State said it talked to St. Francis about whether reintegration in Mexico was logistically possible. Explaining such relocation had been done before, the State expressed concern with Mother's alcohol use stemming from the DUI she got in Alabama—which occurred more than two years earlier in 2022. The State asked for a continuance to explore options for reintegration—

6

perhaps by having Mother complete some case plan tasks while in Mexico—because the State learned Mother wanted to try everything to keep her parental rights.

The GAL stated that this was a "complicated proceeding in the beginning" and she "had some qualms about the filing of it" because the children were left with a caretaker—J.L. The GAL questioned whether the children should have been found CINC since they were purposely left in the care of J.L. However, the GAL believed that when L.X.-Y. broke his arm and J.L. was unable to pay his medical bills, "there wouldn't have been appropriate substitute care which would've triggered the CINC, so it was kind of this difficult gray area." The GAL explained that J.L. was previously believed to be a permanent adoptive resource for the children, but that was no longer an option. She stated that reintegration was not the plan until she recently learned Mother was in touch with her children and St. Francis regularly. The GAL expressed her concern that Mother did not have the chance to be present; that Mother was apparently told reintegration should not be allowed since Mother was not in the country; and that deportation was being used as a reason to find a parent unfit. She also shared her concern that the publication notice in Dodge City was inappropriate because the State knew Mother was out of the country and the last known address for father was in Alabama. Finally, the GAL noted that because there was no longer an adoption resource, delaying the case would not cause a delay in permanency.

Mother's attorney shared Mother's intent to return to Dodge City by January 28, 2025, aiming for reunification with her children upon her return. Counsel reiterated Mother's commitment to her children and her ongoing communication efforts. The district court expressed some concerns about whether things would be different if Mother came back into the United States and was deported again. The district court also shared its reservations about conducting reintegration efforts in Mexico, noting challenges in assessing foreign living conditions. The court stated that "if mom is truly going to be a viable option, I feel like she needs to be here in court," and that "[l]etting her appear by

7

WhatsApp or Zoom or whatever—I mean I don't know her. None of you have met her."
The district court also found that reintegration was not a viable option unless Mother
returned to the country. If she could not return, the district court expected termination:

> "As far as reintegrating the child in Mexico, I'm not going to find that that is a viable
> option. So if that is where this case is going, that's our only option, then you can tee it
> back up for termination proceedings, because I'm not going to consider that a viable
> option. There is no way that we have the ability to assess whether or not the living
> circumstances down there would be appropriate to send children back into, so that's not
> going to be something this Court considers, okay? If it's a matter of mom can really get
> back here next month and start working a reintegration plan here or somewhere that
> can—we can use resources to assess, then that's a different situation."

The district court said that if Mother appeared and proved she had an appropriate
place to live and was not going to be deported again, then it would consider that she may
be a viable option. If Mother remained in Mexico, she was not a viable option. The
district court expressed frustration that there were service issues coming up on the day of
a termination hearing. The district court said that since there was communication with
Mother—"in all good conscience if we have actual communication with her"—
publication would likely be insufficient. The district court continued the case for good
cause to ensure appropriate service for named fathers and to accommodate Mother's
reports that she would be back in the country in January.

The case was set over for a termination hearing on February 7, 2025. A new
Notice of Termination Hearing was filed on December 13, 2024. The accompanying
Report of Service indicated that notice was mailed to one of the fathers at an Alabama
address and to Mother—in care of her attorney, to his law office mailing address. On
December 16, 2024, the State filed a second Request for Notice by Publication and
Affidavit. The document stated:

"The residence and location of father[s] and mother are presently unknown despite unsuccessful attempts by affiant to determine the same. Duly diligent efforts have been made to ascertain the residence of the father[s] and mother, but have proven unsuccessful:

- Mother was deported and left children with a friend and has never attended a Court hearing or worked on case plans.
- [Fathers] contact information is unknown and have never attended a Court hearing or worked on case plans
- [Fathers] may have lived in Alabama."

The same day, the district court entered an Order for Service by Publication on the parents through the Birmingham Times in Alabama and the Dodge City Globe. The Certificates of Publication were filed on January 27, 2025, indicating that publication in the two papers was effectuated.

*Termination hearing*

The district court held the termination hearing on February 7, 2025. Mother appeared by phone—with the assistance of a Spanish interpreter—and through her attorney. Neither father appeared in person, but they were represented by their shared appointed counsel.

At the outset of the hearing, the State explained there were concerns of service, particularly for the fathers, because there was a last-known address in the United States where they had not yet attempted service. The State also described the issues related to Mother's appearance:

"Also, a desire since mom had been in some sort of relatively consistent communication with counsel to try and get her present today. She had also told [her counsel] at our last setting that she had anticipated being back in the United States by this date. We did speak to mother prior to going on the record. She did confirm she is still out of the United

9

States at the border in the California area, but out of—like in Mexico, but in that—towards the west."

Despite those notice and service issues, the State asked to move forward with the proceeding:

"Considering that the fathers aren't present despite attempted efforts to get them served, as well as the fact that mother was given additional time in order to be here and in some fashion we do have her present and able to participate in the hearing, the State would ask to go forward on termination."

The district court turned to the GAL, who said she had raised some significant concerns regarding service and to give Mother a chance to be present. However, she no longer had concerns because attempts had been made to contact the fathers, and Mother was present by phone. Ultimately the GAL expressed her comfort with moving forward in the case.

Mother's attorney confirmed Mother's hope to be present and said nothing about the service issues or her notice of the hearing. Instead, counsel provided a brief introduction to her case:

"[Mother] believed that she was leaving the kids with a person that would take care of them while she was removed to Mexico and apparently that person did not work out and that's where we're at today. But I've talked to her about that one is a U.S. citizen and the other one is on the way to becoming a U.S. citizen, but she loves them dearly and wants them to be reunited with her."

The fathers' attorney confirmed he sent letters to their last-known addresses and the letters had not been returned. Based on the lack of communication from either father, counsel said they had no position on the case.

10

The district court asked the State's attorney what additional efforts had been made to locate the fathers since the last hearing, noting there were no affidavits or other statements of additional attempts included in the court file. The State's attorney explained that the State sent mail to the fathers' last-known addresses and unsuccessfully attempted to call phone numbers associated with the fathers. The district court explained that it "just wanted those noted for the record," and then it found that "based on the additional efforts made by both the State and [the fathers' attorney] on behalf of his clients that notice in regards to both alleged fathers is proper." As to Mother, the district court found that notice was proper as well. The district court also noted that the Certificate of Service by Publication was in the court file and found that it was valid. The parties indicated they were ready to proceed. However, Mother requested a one-week continuance to contact her brothers, who were willing to come to Dodge City, and because she expected to have contact with the fathers the following week. The district court denied Mother's request.

The State proceeded with its case by proffer, without objection by Mother's attorney. According to the State, the children were placed in protective custody in March 2024 after being left with J.L. following Mother's deportation. J.L. contacted DCF after L.X.-Y. broke his arm, and she reported an inability to continue caring for the children without financial assistance. Although Mother initially believed J.L. could serve as a placement, the arrangement ultimately failed due to financial instability and because there was "no foreseeable future" in which Mother would return to the country. The State asserted that if Mother returned to the country, she would likely be here "illegally" making her potentially subject to deportation. The State also cited concerns of Mother's alcohol use—which was not mentioned in its termination motion—and a history of prior DCF involvement, including the 2020 CINC case. The State requested the court to take judicial notice of the affidavits and reports in the CINC cases.

The GAL reiterated much of the same, stating that J.L. proved to be an inappropriate substitute provider. The GAL alleged this was the third case involving the

11

children, and that all three cases involved issues of alcohol abuse or abandonment. She admitted that Mother remained in contact with J.L. and St. Francis but noted Mother was "unable to work any kind of reintegration plan," provide certification of her living conditions, support the children financially, or return to the United States legally. She also requested the court take judicial notice of the child welfare cases from 2020.

Mother, the only witness at the termination hearing, testified on her own behalf—over the phone and through the court interpreter. Mother stated she was in Tijuana, Baja California. She explained she had two options to come into the country—to cross over the border, or there was a "slight possibility" that immigration would grant her a permit to come over to be with her children. She said she had not yet had her first appointment with the attorney she hired in Tijuana.

As to her alcohol use, Mother said she stopped drinking for "quite some time" because her alcohol use caused her problems with caring for her children. She explained she had not done the evaluations or testing but had made an appointment through her attorney to get one of the tests done three days after the hearing. Mother reiterated her desperation to keep her children, who meant everything to her. She said she had been focusing on her job and home in Tijuana, where she had a lot of support and was doing well economically, but that she shifted her focus to returning to the United States when she learned she could not fight for her children from Tijuana.

Mother said she told St. Francis about possible kinship placements with her brothers and her adult daughter in Alabama but had not provided their contact information because St. Francis told her those individuals were not eligible as placements. She testified that she chose J.L. as a placement because she knew her children would be okay with J.L. Mother said her brothers would be interested in a permanent guardianship of the children if allowed the opportunity.

Mother confirmed she had lived at her residence in Tijuana for about seven months. When asked why she did not provide her mailing address to St. Francis, she responded that she provided it through a WhatsApp message approximately four months prior to the hearing. Mother also testified that she had not provided St. Francis with proof of her employment "because the one time that I requested assistance, I asked them if they could help me get the testing done for drug and alcohol abuse. They told me no, there was no way for me to get help. I had to do it all here."

Mother explained that she lived alone and rented. She reported that she had not thought of sending a rental agreement, photos, or videos of the home to St. Francis because it never requested any of that information. She also said she had not sent financial support or gifts for the children because she lacked an address and testified that she thought she "wasn't able to send them anything." Mother further testified that when she mentioned the possibility of sending something to J.L., Mother was told she did not need to send anything. Following Mother's testimony, the parties called no other witnesses and made no closing statements.

*Termination decision*

The district court found Mother failed to make appropriate arrangements for the children's care following her deportation and had not provided for their support or established a viable plan for reunification. The district court specifically said it was unsure and "maybe no one really knows" when the children were left with J.L. and:

> "While the intentions of the mother may have been good in leaving the children with that
> friend, she did not make adequate provisions to make sure that those children were taken
> care of, and those provisions include making sure that the friend was able to provide
> consent for any necessary medical care that may have been needed by the children,
> providing monetary support for those children, making sure that she could have regular
> contact in communication with those children, and ensuring that that third party that she

13

left the children with would be willing to continue to have the children in her home and provide care for them. Likewise, the mother has not provided any support since the time that the children were taken into state custody. She has not been able to change her circumstances or her living arrangements to become stable to where that the children—to where she could be quite honestly a viable placement for her own children."

The district court found it was "not likely that [Mother] will be able to be a viable option for her children," because she was deported and had some history of alcohol dependency:

"[H]aving been now deported from the United States twice, having the history that there's ongoing alcohol dependency and abuse and the fact that the same type of behavior in the allegations that have brought the children into custody in this case have also been repeated in two prior cases. The mother says that she has—that she's working with an attorney now and that she's exploring her options to be able to return to the United States legally. However, again, . . . this case has been ongoing for almost a year now and she has been making statements like that at least for the last several months that I've been personally aware of, and yet there does not seem to be any progress or advancement that has been made towards being able to successfully do that."

The district court found the agencies provided reasonable efforts and made appropriate public and private resources available to try to rehabilitate the family "not only in this case, but in the two prior cases," but that those reasonable efforts were unsuccessful. The district court also found Mother's "failure[] to maintain regular visitation, contact or communication with the children is a failure to assume the duties and responsibilities of being a parent." The district court concluded:

"The Court finds that based on the evidence presented today, that neither the mother's circumstances nor the two alleged fathers' circumstances are likely to change in the foreseeable future and that is therefore in the best interest of the minor children to terminate the parental rights of all parents at this time."

14

The court filed the Finding of Unfitness and Order Terminating Parental Rights on February 10, 2025. The order set out the district court's findings, specifically that the evidence was clear and convincing that Mother was unfit due to: failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family, citing K.S.A. 38-2269(b)(7); lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child, citing K.S.A. 38-2269(b)(8); and failure to maintain regular contact with or to pay any financial support to the children. The district court ordered the termination of Mother's parental rights, finding termination was in the best interests of the children and the physical, mental, or emotional needs of the children would be best served by termination.

Mother timely appealed.

DISCUSSION

Parents have a constitutionally protected liberty interest in a continuing relationship with their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697, 187 P.3d 594 (2008). "A natural parent who has assumed parental responsibilities has a fundamental constitutional right to a parental relationship with his or her child protected by the Kansas and United States Constitutions." *In re K.W.D.*, 321 Kan. 100, 109, 573 P.3d 221 (2025). A parent's interest in the care, custody, and control of their children has been recognized by the United States Supreme Court as "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Thus, before a parent can be deprived of the right to the care, custody, and control of their child, they are entitled to due process of law. *In re A.S.*, 319 Kan. 396, 402, 555 P.3d 732 (2024). These rights are guaranteed to both citizens and noncitizens alike. See U.S. Const. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the

15

equal protection of the laws."); *Plyler v. Doe*, 457 U.S. 202, 210-12, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982) (holding that individuals in this country unlawfully are nevertheless guaranteed due process of law and equal protection under the laws).

Kansas law authorizes a court to terminate a parent's rights to their child only upon a finding of "clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). Thus, before terminating a parent's rights to their children the district court must make two distinct findings—unfitness rendering the parent unable to care properly for the child and that such unfitness is unlikely to change in the foreseeable future. Clear and convincing evidence in the termination context means a rational factfinder "could have found the determination highly probable." *In re K.W.D.*, 321 Kan. at 110.

This court reviews the district court's findings of unfitness and its foreseeability of continuing by reviewing the evidence in the most favorable light to the State to determine whether clear and convincing evidence supports those findings. 321 Kan. at 110. In conducting that review, this court does not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). If this court's analysis requires interpretation of the law, such review is unlimited. *In re N.E.*, 316 Kan. 391, 402, 516 P.3d 586 (2022).

Mother raises four issues in her appeal. The first two issues concern alleged due process violations—an alleged lack of compliance with notice and the district court's reliance on a factor not included in the State's motion for termination. Her remaining two issues allege the district court abused its discretion in finding her unfit and that termination was in the children's best interests.

At the termination hearing in this case, the State proceeded solely by proffer, not producing any witnesses or other evidence. The GAL also made statements and argued termination was in the children's best interests. Mother was present by phone and also had counsel representing her at the hearing. The State may use proffers of evidence "[i]n evidentiary hearings for termination of parental rights under this code, [and] the case may proceed by proffer as to parties not present, unless they appear by counsel and have instructed counsel to object." K.S.A. 38-2248(f). There is no indication Mother or her counsel objected to the State's use of a proffer of evidence. The Kansas Supreme Court recently decided *In re A.K.*, 320 Kan. 805, 811, 572 P.3d 763 (2025), which directly relates to this matter.

In *In re A.K.*, the mother did not appear for the termination hearing. The State moved to proceed by proffer by noting the mother was absent and she had not instructed her counsel to object to a proffer. Counsel admitted that the mother had not instructed him to object, and the district court agreed to proceed by proffer. The State then alleged the mother was a chronic drug user, which rendered her unable to care for her child, and had failed to complete various case plan tasks. The GAL argued termination was in the best interests of the child. The mother's counsel offered no evidence or argument. The district court terminated the mother's rights after concluding she was unfit—based only on the State's proffer.

The mother appealed by arguing, in part, that K.S.A. 38-2248(f) violated her constitutional right to due process because it allowed for a finding of unfitness based only a proffer of evidence rather than evidence. The court did not address the constitutional claim, instead choosing to resolve the claim based on statutory grounds. The court concluded the district court misapplied K.S.A. 38-2248(f), which merely allows a party to

make a proffer at an evidentiary hearing regarding the termination of parental rights. 320 Kan. at 812.

In its review, the court distinguished "evidence" from a "proffer" of evidence. The court explained that "a proffer is not evidence" but is merely a description of "the substance of [the party's] evidence against an absent party." 320 Kan. at 813-14. The court then described "evidence" as witness testimony given under oath which is subject to cross-examination and is limited to the witness' personal knowledge, experience, education, or training; and relevant and authenticated physical evidence. 320 Kan. at 814. Both witness testimony and physical evidence have a "measure of reliability, so that it tends to prove a material fact." 320 Kan. at 814. In contrast, the court explained that a proffer shares no indicia of reliability with evidence because it only "demonstrates the 'substance of' the evidence sought to be introduced." 320 Kan. at 814 (quoting *State v. Swint*, 302 Kan. 326, 332, 352 P.3d 1014 [2015]). The court concluded K.S.A. 38-2248(f) does not give a district court authority to make a finding of unfitness—and thus terminate parental rights—based on a proffer alone because a proffer is not evidence. 320 Kan. at 815.

As the court stated in *In re A.K.*, reliance on a proffer alone cuts against the mandate imposed by K.S.A. 38-2269(a) that clear and convincing evidence must support a district court's unfitness findings. As a result, while a proffer can be used at an evidentiary termination hearing, a party "will need to present more to establish unfitness." 320 Kan. at 814-15.

At the hearing in this case, the State's proffer included the following allegations:

1. The children were put "into protective custody because they had been left with a family friend for several weeks after [Mother] had been deported."

2. The family friend, J.L., contacted DCF after L.X.-Y. broke his arm and explained she could no longer care for the children without financial assistance.

3. Mother's deportation was not the only issue in the case but was one of the reasons it was filed.

4. As the case went on, the State learned of Mother's history with DCF in Alabama two years prior in which alcohol was an issue.

5. The children's communication with Mother during the pendency of the case became more negative and distant.

In sum, the State's proffer alleged Mother left her children in the care of a family friend following her detainment and involuntary deportation—the State did not specifically allege Mother abandoned her children. However, the family friend was not a suitable long-term placement because the friend needed financial assistance to continue caring for the children. The State also referenced the Alabama welfare case, which resulted in the reintegration of Mother and her children. The State also requested the district court to take judicial notice of the affidavits and reports filed in the CINC cases.

The GAL spoke at the hearing and argued that Mother abandoned her children, referenced the other child welfare cases, and otherwise relied on Mother's deportation to Mexico to argue it was proper to terminate her rights. She also said the present CINC case was the third child welfare case involving the children. The GAL pointed to Mother's inability to "adjust her circumstances to provide for the needs of the children." She further said Mother was "unable to work any kind of reintegration plan" or provide verification of "her living circumstances or ability to care for the children."

Kansas law defines "abandon" in this context as "to forsake, desert, or without making appropriate provision for substitute care." K.S.A. 38-2202(a). Mother was involuntarily detained and deported. She attempted to make an appropriate provision for substitute care by placing her children with J.L., a family friend the children knew. In

fact, DCF helped Mother set up a temporary guardianship for J.L. and DCF considered J.L. an adoptive placement for some time. If L.X.-Y had not broken his arm this case may never have been filed—that is, J.L. was an appropriate substitute care provider until she needed financial assistance for the children's medical care. This cuts against an argument that Mother abandoned the children—which the court did not specifically find. See, e.g., *In re Adoption of Posy*, 94 Mass. App. Ct. 748, 753, 119 N.E.3d 747 (2019) (finding father did not abandon children after his involuntary deportation when the father maintained contact, the State knew the father's location, and father suggested care providers for his children in his absence).

While the district court made no finding that Mother abandoned her children, to the extent its ultimate determination rested on this premise—there is not clear and convincing evidence of abandonment. In this case, Mother identified J.L. as a substitute care provider and executed appropriate paperwork; Mother was in contact with the children and St. Francis; Mother testified that she sought solutions but was denied options because she was out of the country; and Mother also testified that she told St. Francis about her brothers and adult daughter, who were all potential placement options. Additionally, as soon as the State was on notice that J.L. could no longer provide for the children due to financial issues concerning medical treatment, there were avenues for reuniting the children with Mother other than filing a CINC petition and seeking termination of parental rights. See *In re Interest of Angelica L.*, 277 Neb. 984, 1000-01, 767 N.W.2d 74 (2009) (discussing the Vienna Convention on Consular Relations and its application in the child welfare context when international communication and cooperation is necessary).

The district court's findings of unfitness were for: failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family (K.S.A. 38-2269[b][7]); lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child (K.S.A. 38-2269[b][8]); failure to

20

maintain regular contact with the children (K.S.A. 38-2269[c][2]); and failure to pay any financial support to the children (K.S.A. 38-2269[c][4]). To summarize, the State's proffer and GAL recommendation before the district court supporting a finding of unfitness included: an allegation of prior child welfare cases that resulted in reintegration, the argument that Mother abandoned the children, and Mother's involuntary deportation.

Mother testified at the hearing, which distinguishes this case from *In re A.K.*, where the mother did not attend the hearing or present evidence. Thus, this court must decide whether Mother's testimony—the only evidence provided at the termination hearing—provided clear and convincing evidence to support a finding of unfitness. The GAL's statements were not made as a witness and do not constitute clear and convincing evidence on which the court could base its decision. See *In re A.K.*, 320 Kan. at 808, 812, 815 (although the GAL provided statements at the termination hearing the court did not consider those statements evidence before the district court for consideration); *Evenson Trucking Co. v. Aranda*, 280 Kan. 821, 842, 127 P.3d 292 (2006) ("Attorney arguments are not evidence.").

Mother testified that she was working with a local attorney to see if she could apply for a permit to return to the United States to be with her children. She also said she could consider crossing the border. When asked about her "substance abuse problem," Mother said she had quit drinking because she understood her drinking had previously caused her to neglect her children. She admitted she could not do the evaluations as of the hearing date but had an appointment the following week for one of the tests. When asked if she loved her children, Mother said:

> "Yes. My children are my whole world. I love them with all my heart. I
> recognize that I made a lot of mistakes. I realize that I caused—Because of my alcohol

21

dependency, I caused a lot of problems, but my children are everything to me and I'm fighting for them. I do not want to lose my children."

Counsel then questioned if Mother realized "she'd be on a very short leash" if she came back to the country and tried to reintegrate. Mother said she was "willing to do everything that's required of me and I will even pay for child support every week for my children." Mother testified that she had employment, a home, and lots of support. Mother also confirmed her brothers, who lived in Alabama, were willing to come retrieve the children and take care of them, and that her adult daughter was another kinship placement option—but she said she was told neither was an eligible placement option.

On cross-examination, Mother said she had not provided contact information for her brothers or adult daughter because nobody had requested it and because she was told they were not eligible placement options. She later testified her brothers would be willing to be permanent guardians for the children. She said she had provided St. Francis with her current address, at which she had resided for about seven months. Mother confirmed she lived alone and that she was never asked to provide photos of the residence or a rental agreement. When asked if she was sending money to help support her children, Mother said she did not know where to send any money—but that she had offered J.L. money. Similarly, when asked if she had sent presents, Mother again said she did not know where to send gifts, but that she would be willing to do so. She confirmed that she had regular contact with St. Francis and her children. Mother testified that she had asked for St. Francis' help with getting substance abuse testing done but was told it could not assist her.

The court asked Mother about the legal status of her brothers, about which Mother was uncertain. Both the State and GAL asked the court to take judicial notice of certain items, with the State focusing on the affidavits and reports from the underlying CINC cases, and the GAL asking for notice of the 2020 child welfare cases. A district court may

take judicial notice of certain facts and propositions either on its own initiative or at the request of a party. K.S.A. 60-409. Typically, a district court makes findings in the record as to whether it took judicial notice of records or some other matter about which judicial notice is permitted. See *In re Adoption of T.M.M.H.*, 307 Kan. 902, 917, 416 P.3d 999 (2018) (noting that while grandmother asked the court to take judicial notice, the record failed to include a ruling on the issue); *In re D.H.*, No. 127,282, 2025 WL 1603354, at *2 (Kan. App. 2025) (unpublished opinion) (noting the district court stated it was taking judicial notice of the court file and social file as well as the State's termination motions and the legal authorities cited therein). Here, the district court did not state whether it took judicial notice of the 2020 child welfare cases or the underlying CINC cases. The GAL asked Mother if she remembered "a case in 2020," but she only testified "yes"— there was no testimony regarding the substance of any prior cases. When ruling at the termination hearing, the district court did not make any factual findings regarding the earlier child welfare case and only mentioned it in the context of saying Mother was not "a viable option for her children" by saying Mother had been previously deported and "the fact that the same type of behavior in the allegations that have brought the children into custody in this case have also been repeated in two prior cases."

CINC cases include "the official file containing all the pleadings filed in district court and the social file containing reports and evaluations of the parties involved in the case." *In re K.H.*, 56 Kan. App. 2d 1135, 1141-42, 444 P.3d 354 (2019). Under K.S.A. 38-2249(b)(1), a district court may "not consider or rely upon any report not properly admitted according to the rules of evidence, except as provided by K.S.A. 38-2219, and amendments thereto." While K.S.A. 38-2219(e)(2) permits a court in a parental termination proceeding to read all reports, it states that "no fact or conclusion derived from a report shall be used as the basis for an order of the court unless the information has been admitted into evidence following an opportunity for any party or interested party to examine, under oath, the person who prepared the report."

23

There is also no information in the record indicating that any reports—from either the 2020 cases or the underlying CINC cases—were admitted into evidence as required by K.S.A. 38-2219 and K.S.A. 38-2249. Accordingly, the only evidence before the district court in this case was Mother's testimony. See *In re A.K.*, 320 Kan. at 815 (proffer not evidence); see also *In re K.H.*, 56 Kan. App. 2d at 1141-42 (finding it had no way of knowing what documents the district court may have reviewed in making its decision to terminate when the record did not make it clear); *In re Ky.H.*, No. 114,508, 2016 WL 1079500, at *4 (Kan. App. 2016) (unpublished opinion) (finding the children's social files were not admitted into evidence and the district court did not take judicial notice of them, meaning the reviewing court could not consider the reports when evaluating the sufficiency of the evidence to terminate parental rights).

For the sake of completeness, this court has endeavored to review all records referenced by the State to determine if they contain any evidence supporting the court's findings of unfitness. The single affidavit found in the record—which was not admitted into evidence at the hearing—is from DCF and notes that Mother was not in the United States and provides a summary of the 2020 Kansas and 2022 Alabama child welfare cases. The three reports in the social file dated May 3, 2024, July 1, 2024, and May 6, 2025, were not admitted into evidence at the hearing. There does not appear to be any information in those reports upon which the district court relied on in making its termination decision. Notably, the court was unable to identify any records from the 2020 CINC case files—official or social.

Following Mother's testimony, the district court made statements about Mother's potentially good intention in leaving the children with J.L., but found Mother failed to make sure the children were adequately cared for, failed to provide monetary support for the children, and failed to change her circumstances or living arrangements to be a stable placement for her children. The court found the agencies had made reasonable efforts to rehabilitate the family but that such efforts were unsuccessful and that Mother had failed

24

to maintain regular visitation, contact, or communication with the children, which reflected a failure to assume the duties and responsibilities of being a parent.

Mother testified that she had employment, stable housing, and support in her community. She also testified that she had quit drinking and sought help from St. Francis to get evaluated, but that St. Francis did not help. Nothing from the State (not even the proffer) contradicted that testimony. She made clear her desire to regain custody of her children, saying she would do everything to get them back. Mother also testified that she had put her effort toward returning to the United States rather than reintegrating with her children abroad because the court had previously said that reintegration abroad was not an option. At a hearing on December 23, 2024, the court explained that it did not believe Mother's children could be reunited with her outside the United States:

> "As far as reintegrating the child in Mexico, I'm not going to find that that is a viable option. So if that is where this case is going, that's our only option, then you can tee it back up for termination proceedings, because I'm not going to consider that a viable option."

Generally, parents are entitled to retain custody and parent their children in whatever country they are residing or living—something the GAL conceded at the December 3, 2024 hearing. If Mother had chosen to live in Guatemala or Mexico—or any other country—with her children, the State would have no right to seek to terminate her parental rights based on that decision. Mother was involuntarily deported but had stable employment and housing in Mexico—certainly living in Mexico, without more, could not be a basis to terminate Mother's parental rights.

The Nebraska Supreme Court considered this issue in *In re Interest of Angelica L.*, a case where the district court terminated the mother's rights after she was deported to Guatemala. In reversing the termination, the court noted:

25

"We are mindful that Daniel has always lived in the United States and that Angelica has been in the United States since she was an infant. We also acknowledge that the children seemed to be doing well in their foster home. But unless Maria is found to be unfit, the fact that the State considers certain adoptive parents, in this case the foster parents, 'better,' or this environment 'better,' does not overcome the commanding presumption that reuniting the children with Maria is in their best interests—no matter what country she lives in. As we have stated, this court '"has never deprived a parent of the custody of a child merely because on financial or other grounds a stranger might better provide."'" 277 Neb. at 1009.

Other courts have come to similar conclusions. See, e.g., *In re Doe*, 153 Idaho 258, 265, 281 P.3d 95 (2012) ("The fact that a child may enjoy a higher standard of living in the United States than in the country where the child's parent resides is not a reason to terminate the parental rights of a foreign national."); *In re B and J*, 279 Mich. App. 12, 22, 756 N.W.2d 234 (2008) (finding belief that children would have a better life in the United States than in parent's native country could not support a best interests finding).

The court made no finding of unfitness related to alcohol use, but it did seem to consider this issue when it found Mother unfit under K.S.A. 38-2269(b)(7) for failure of agency efforts to rehabilitate the family and K.S.A. 38-2269(b)(8) for failure of Mother to adjust her circumstances. At one point the court noted its concern related to Mother's alcohol use inhibiting reunification with her children outside the United States, but the only evidence available regarding Mother's efforts in that regard was her testimony that she sought help from St. Francis to get the required evaluations but that St. Francis did not help. "[T]he obligation to exert reasonable efforts toward reunification equally applies with respect to parents who reside in foreign countries." *P.R.P. v. Marshall County Department of Human Resources*, 419 So. 3d 1018, 1025 (Ala. Civ. App. 2024) (citing *Matter of A.M.C.-R.*, 306 Or. App. 360, 367, 473 P.3d 1167 [2020]). There was no evidence at the hearing that Mother continued to drink—or that she had a substance abuse issue. The State cited Mother's driving under the influence offense in 2022 and then

26

mistakenly indicated Mother's most recent detainment was also because of alcohol use—but the record shows she was pulled over for speeding and arrested for driving without a license. The State offered no evidence of Mother's alcohol use or of alcohol use impacting her parenting. The proffer related to Mother's driving under the influence offense, which occurred more than two years prior, did not establish clear and convincing evidence of an alcohol problem preventing her from currently caring for her children much less demonstrating that such would be a problem for the foreseeable future. The district court's findings under K.S.A. 38-2269(b)(7) and subsection (b)(8) are not supported by clear and convincing evidence.

In its proffer at the termination hearing, the State did not identify any efforts by St. Francis to assist Mother in meeting the goals of the reintegration plan related to alcohol assessments or otherwise, nor does the district court's decision specify any efforts. A representative from St. Francis was at the termination hearing but was not called as a witness to rebut Mother's testimony that she requested help from St. Francis but was denied assistance. How could St. Francis have provided reasonable efforts and resources to help Mother with the sole issue of concern—her alleged alcohol abuse—when the only evidence at the hearing was Mother's testimony that it refused to assist her with getting an evaluation? Additionally, Mother testified about her efforts to adjust her circumstances—she quit drinking alcohol, had stable housing for seven months in Mexico, had a stable job, and had family support—and there was no evidence contradicting that testimony. Therefore, the district court's findings of unfitness under K.S.A. 38-2269(b)(7) and (b)(8) are not supported by clear and convincing evidence.

The district court also found Mother failed to maintain regular contact but that is also not shown by the record. In its motion for termination, the State conceded Mother had remained in contact with the children through WhatsApp. The GAL also said at the termination hearing that Mother had remained in contact with St. Francis. The court even admitted that Mother maintained contact with both the children's placement and St.

27

Francis. Mother's temporary physical distance from her children did not prevent her contact with them, and the district court's finding that Mother was unfit under K.S.A. 38-2269(c)(2) is not supported by clear and convincing evidence.

A parent's involuntary deportation—alone—is not a statutory basis for a finding of unfitness under the Kansas Code for Care of Children. K.S.A. 38-2201 et seq. Other courts have had the opportunity to address this issue and have come to similar conclusions based on their statutory schemes. See, e.g., *V.G.J. v. Tuscaloosa County Department of Human Resources*, 368 So. 3d 886, 895 (Ala. Civ. App. 2022) (deportation alone is insufficient grounds for termination); *B.V. v. Department of Children and Families*, 328 So. 3d 48, 51-52 (Fla. Dist. Ct. App. 2021) (same); *In re Adoption/Guardianship of C.A. and D.A.*, 234 Md. App. 30, 53 n.6, 168 A.3d 1088 (2017) (same); *In re B and J*, 279 Mich. App. at 19 (noting State should not be able to create the situation that results in a termination finding—such as report an undocumented parent to authorities and then claim the parent abandoned the child or is otherwise unfit). Nevertheless, the State admits in its brief that "the primary reason [M]other's rights are being terminated is because she was deported." To the extent the district court found Mother unfit because of her lack of physical contact with her children based on her involuntary deportation—that was improper.

The State contends that a "deported parent should be treated similarly to an imprisoned parent." Even if this court were to ignore the glaring distinction between an incarcerated parent and an involuntarily deported parent (that the deported parent is still able to provide for and care for their child, just in a different location than the United States)—the Kansas Code does not provide a mechanism for automatically terminating a parent's rights due to imprisonment. See *In re T.H.*, 60 Kan. App. 2d 536, 549-50, 562, 494 P.3d 851 (2021) (reversing the termination of a father's rights despite his incarceration due to a felony conviction and an inability for his child to reintegrate into his home for multiple years); *In re D.C.N.*, No. 127,540, 2025 WL 3250919, at *1 (Kan.

28

App. 2025) (unpublished); *In re B.S.O.*, 234 N.C. App. 706, 711-12, 760 S.E.2d 59 (2014) (differentiating incarceration and deportation by finding "once the deported parent has been removed from this country, he would be free to work, send funds to support a child, or communicate with a child by phone, internet, or mail from his own country"); *In re E.N.C.*, 384 S.W.3d 796, 806 (Tex. 2012) ("Unlike an incarcerated individual, a person who is deported is able to work, have a home, and support a family."). Both courts in *In re B.S.O.* and *In re E.N.C.* also found children could be reunited with a deported parent in the country where the parent was deported to, further distinguishing incarceration from deportation. 234 N.C. App. at 712; 384 S.W.3d at 806.

The State admits that St. Francis had experience in international reunification. As explained before, the child who is not a United States citizen was unable to receive medical insurance which inhibited the temporary guardian's ability to continue to care for the children. The court's early determination that the children could not be reunited with Mother outside the United States is not supported by the record.

Finally, in its order, the district court also notes Mother "failed to pay any financial support to her children." K.S.A. 38-2269(c)(4) allows a district court to find a parent unfit based on the "failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay." However, this factor was not included in the State's termination motion—an error raised by Mother in her appeal. As many panels of this court have acknowledged, a district court should not rely on statutory grounds of unfitness that the State has not identified in its motion to terminate parental rights. See, e.g., *In re E.K.*, No. 125,688, 2023 WL 4677009, at *7 (Kan. App. 2023) (unpublished opinion) ("[A] district court cannot find a parent unfit and, thus, terminate his or her rights on grounds not fairly outlined in the State's motion."); *In re D.G.*, No. 125,366, 2023 WL 2194320, at *3 (Kan. App. 2023) (unpublished opinion) (declining to consider factors found by the district court not raised in motion to terminate); *In re B.C.*, No. 125,199, 2022 WL 18046481, at *3 (Kan. App. 2022) (unpublished opinion) (relying

on a factor not alleged in its motion to terminate "almost certainly would have deprived [the father] of fair notice" and "compromised his constitutional due process rights"); *In re A.J.*, No. 124,854, 2022 WL 15549863, at *5 (Kan. App. 2022) (unpublished opinion) (State concedes error when district court finds unfitness on statutory ground not included in motion to terminate); *In re K.H.*, No. 121,364, 2020 WL 2781685, at *7 (Kan. App. 2020) (unpublished opinion) (parent denied due process when district court relied on factor of unfitness not alleged in motion to terminate). Mother testified that she was employed and had offered to send financial support to the temporary guardian but was told it was unnecessary. The district court lacked clear and convincing evidence to support the finding of unfitness under this factor and particularly that it was unlikely to change in the foreseeable future.

There was not clear and convincing evidence to support the court's unfitness findings. The district court erred in relying on the State's proffer as the State's sole evidence of Mother's unfitness—and the proffer in conjunction with Mother's testimony did not provide clear and convincing evidence for the district court's unfitness findings or that they were unlikely to change in the foreseeable future. Moreover, the clear language of the statute permitting a proffer calls into question whether it was proper to permit the State to offer a proffer at all because Mother appeared at the hearing via phone. See *In re A.K.*, 320 Kan. at 813 ("Based on the legal meaning of 'proffer,' K.S.A. 38-2248[f] authorizes the district court to permit a party to describe the substance of its evidence against an absent party who has not instructed their counsel to object to a proffer."). However, this issue need not be decided because the court's decision requires reversal. Nevertheless, the statutory language is clear: a party may proceed by proffer against an *absent* party unless that person appears by counsel and has instructed counsel to object.

CONCLUSION

The district court erred in relying on the State's proffer as evidence to support the termination of Mother's parental rights and the only evidence at the termination hearing did not support the district court's findings of unfitness. The district court's termination of Mother's parental rights is reversed. Any further proceedings in this matter must follow all notice and service requirements, and the district court must follow all statutory guidelines and consider all options for reunification and placement, being mindful that Mother's location does not automatically deprive her of the constitutional right to parent.

Reversed and remanded with directions.